**UNITED STATES of America, Plaintiff,**

v.

**A & N CLEANERS AND LAUNDERERS, INC., Ben Forcucci, Marine Midland Bank, N.A., Jordan W. Berkman, John A. Petrillo, Joseph Curto, and Mario Curto, Defendants.**

**MARINE MIDLAND BANK, N.A., Third–Party Plaintiff,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, St. Paul Mercury Insurance Company, Utica Mutual Insurance Company, the North River Insurance Company and United States Fire Insurance Company, Third–Party Defendants.**

No. 89 Civ. 6865 (RWS).

United States District Court,
S.D. New York.

April 3, 1992.

As Amended April 16, 1992.

§ 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675, for costs incurred and to be incurred by the Government in response to the release or threatened release of hazardous substances at the Brewster Wellfield Site (the "Site") in Putnam County, New York. The Berkman Defendants and Marine have cross-moved for summary judgment dismissing the complaint against them. For the following reasons, the Government's motion is granted; Marine's motion is denied; and the Berkman Defendants' motion is denied.

*The Parties*

Defendant Jordan W. Berkman ("Berkman") is an attorney admitted to practice in New York State who has specialized in real estate law for approximately 33 years. Berkman was the Village Attorney for the Village of Brewster on a part-time basis from 1975 through 1990. John A. Petrillo ("Petrillo") was a builder and was engaged in the construction business in 1978 and all times relevant to this action. Mario and Joseph Curto (the "Curtos") are retired individuals. The Berkman Defendants presently hold title as one-third tenants in common to a piece of real property and the improvements thereon, consisting of a single one-story building (the "Building") and a parking lot, located at the intersection of Routes 6 and 22 in the Town of Southeast, in Putnam County, New York (the "Property").

Defendant Ben Forcucci ("Forcucci") is the sole shareholder, officer and director of A & N. He alone was responsible for the day-to-day operation of the dry cleaning machines and the disposal of waste.

Defendant Marine Midland Bank, N.A. ("Marine") was the lessee of the Property from 1970 through 1990. From 1970 to the present, Marine has maintained a branch bank at the Property. Since 1990, Marine's lease at the Property relates only to that part occupied by its branch office.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., Paul K. Milmed, Asst. U.S. Atty. and Beverly Kolenberg, Sp. Asst. U.S. Atty., New York City (Sara L. Shudofsky, Asst. U.S. Atty., of counsel), for U.S.

Steven A. Greenwold, P.C., Poughkeepsie, New York (Jonathan D. Katz, of counsel), for defendants A & N Cleaners and Ben Forcucci.

Edwards & Angell, New York City (Lynn Wright, of counsel), for defendants Jordan W. Berkman, John A. Petrillo, Joseph Curto and Mario Curto.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, New York (Robert E. Glanville, of counsel), for third-party plaintiff.

OPINION

SWEET, District Judge.

Plaintiff United States of America (the "Government") has moved for partial summary judgment against defendants A & N Cleaners and Launderers, Inc. a/k/a Alben Cleaners & Launderers ("A & N" or "Alben Cleaners"), Ben Forcucci ("Forcucci"), Marine Midland Bank, N.A. ("Marine"), Jordan W. Berkman ("Berkman"), John A Petrillo ("Petrillo") and Joseph and Mario Curto (the "Curtos") (collectively with Berkman and Petrillo, the "Berkman Defendants") pursuant to Rule 56, Fed. R.Civ.P. on the ground that the defendants are jointly and severally liable under

*Prior Proceedings*

The Government filed its complaint on October 16, 1989 (the "Complaint"). On June 5, 1991, this court ordered that the case be bifurcated for the litigation of liability and damages.

*Background*

This action arises out of the Government's investigation of and remedial actions relating to contamination at the Brewster Well Field in Putnam County, New York (the "Site" or the "Well Field"). The Government has alleged that releases of hazardous substances from the Property caused it to incur response costs for which the defendants are liable.

*The Property and the Building*

The Property consists of a one-story brick building (the "Building") akin to a shopping mall, which is surrounded by a parking lot and adjacent grassy area on a total of approximately 1.8 acres. The Building occupies 12,500 square feet and is currently occupied by a Marine branch office, A & N and a limousine service company. The Property is located approximately 900 feet from the Site, across the East Branch of the Croton River to the south. Significant to this action, a floor drain traverses the entire length of the interior of the Building which allegedly empties into a dry well (the "Dry Well") under the parking lot in the rear of the Property near the septic tank.

Until 1979, title to the Property was held by Six & Twenty–Two Real Estate Company ("Six & Twenty–Two"). Effective October 1, 1970, Marine leased the entire Property from Six & Twenty–Two for a term of ten years, with a renewal option for two successive five year terms (the "Marine Lease"). Both renewal options were exercised, giving Marine a continuous leasehold over the Property from 1970 through 1990. Marine currently holds a two-year lease for only that portion of the Property occupied by its branch office.

Under the Marine Lease, Marine was obligated to maintain fire, casualty and liability insurance on the Property, and to maintain the Property in good condition and repair. Marine also was obligated to com-

ply with all governmental rules and regulations for the prevention or abatement of nuisances or other grievances relating to the Property. Marine was permitted to alter the Building, to change the grade of any land surrounding the Building, to erect embankments and/or retaining walls, and to place, alter or remove any temporary building on the Property. Marine had the unconditional right to sublet all or part of the Property or to assign the Marine Lease, but remained obligated to pay rent on the entire Property and to perform its obligations under the Marine Lease regardless of any subleases or assignments.

The Marine Lease was subject and subordinate to prior leases to portions of the Property. Six & Twenty–Two assigned to Marine all of its right, title and interest in each of those leases and authorized Marine to collect rents and enforce all of the obligations of the tenants under them. One of the leases was held by Pircio's Aristocratic Cleaners Corp. ("Pircio's") and was to run until November 30, 1972 (the "Pircio's Lease"). The Pircio's Lease provided that the premises were to be used and occupied as a dry cleaning establishment and that responsibility for the care and maintenance of the Dry Well belonged to Pircio's. On October 5, 1970, Marine notified Pircio's to make all rent payments to Marine "as your new landlord." Glanville Aff. Ex. F.

Shortly thereafter, Marine was notified that A & N had succeeded to Pircio's rights under the Pircio's Lease. *Id.* Like Pircio's, A & N occupied the premises as a dry cleaning business. In early 1971, Marine wrote to A & N to request that the store relocate from the northwest corner of the Building to a location on the north side of the Building, which move was to be financed by Marine. In consideration for the move, the Pircio's Lease was extended through October 31, 1977, and A & N was given the option to renew for one three-year term and one two-year term. In 1982, A & N entered into a sublease with Marine, running through 1985 (the "1982 Sublease"). The 1982 Sublease specifically provided that the premises would be used and occupied for a dry cleaning, rug clean-

ing and laundry establishment. The 1982 Lease contained no provision regarding the Dry Well. Marine extended the lease term on August 12, 1985, subject to cancellation by either party on 90–days notice.

Meanwhile, the Berkman Group had purchased the Property from Six & Twenty-Two on March 2, 1979, taking title to the Property subject to the Marine Lease. The Building is presently occupied by three commercial establishments, including a Marine branch office and A & N's dry cleaning business.

*The Site and the Contamination*

The Site supplies water to the Village of Brewster ("Brewster") and parts of the Town of Southeast in Putnam County. Aquifers beneath lands owned by Brewster supply the Well Field. In 1978, the Putnam County Department of Health ("PCDH") detected contamination in the groundwater at the Well Field in the form of volatile organic compounds including perchloroethylene ("PCE") and trichloroethylene ("TCE"). Residents were urged by the PCDH to boil their water before drinking it. In response to the contamination, Brewster conducted several studies to identify possible alternative groundwater sources and to remove the volatile compounds. During 1978 and 1979, contaminant source investigations were also performed by the PCDH and the New York State Department of Environmental Conservation ("NYSDEC"). Based on these studies, the Village installed and began operating an air stripper in 1984 to treat the water supply.

In September 1983, the United States Environmental Protection Agency ("EPA") placed the Site on the National Priorities List established pursuant to § 105 of CERCLA, 42 U.S.C. § 9605. Subsequently, the EPA and the NYSDEC entered into a cooperative agreement whereby NYSDEC's studies of the Site would be financed by the Superfund. In 1985 and 1986, GHR Engineering Associates ("GHR") conducted soil and groundwater sampling to identify the extent and potential sources of the contamination. (This study shall hereinafter be referred to as

"OU One"). A & N and the Dry Well, together with a number of other commercial establishments, were considered as possible sources of the contamination. However, OU One did not definitively establish the source of the contamination. The Record of Decision of September 30, 1986 ("ROD One") recommended installing a second air stripper.

A second study was performed in 1987 by EBASCO Services, Inc. ("EBASCO") (This study shall hereinafter be referred to as "OU Two"). Again, A & N and the Dry Well were a subject of the investigation. This time, the remedial investigation report ("OU Two RI") and Record of Decision for OU Two ("ROD Two") identified the Dry Well as a source of the Well Field contamination. Wing Dec. Ex. B at 64; *id.* Ex. C. The ROD Two provided for the excavation, treatment and disposal of the Dry Well, the Dry Well sediments and the surrounding contaminated soils. *Id.* Ex. C.

*A & N's Disposal of Hazardous Waste on the Property*

Forcucci personally operated A & N and was responsible for the day-to-day operation of the dry cleaning machines and of the disposal of waste. In the dry cleaning process, clothes are cleansed in a washer by agitation with a solvent, in this case, PCE. After washing, the clothes are transferred to dryers to remove as much solvent as possible. During the drying phase, the condensed PCE is recovered and collected in a bucket in front of each dryer for re-use; water containing PCE from the water separator of the dryer is collected in a bucket at the back of the dryer.

Forcucci admittedly disposed of the PCE-infused waste water regularly through the floor drain of the Property. The date after which he ceased this practice and began storing waste water in 55–gallon containers is in dispute; the defendants claim that 1978 is the operative date, while the Government contends that the disposal of hazardous substances continued through at least 1983.

The United States claims to have incurred approximately $3 million in response costs in connection with the contamination

at the Site. However, in light of the bifurcation, the cost of the Government's response is not in issue at this time.

## I. CERCLA [1]

Congress enacted CERCLA in 1980, and amended it in 1986, Pub.L. 99–499, 100 Stat. 1613 (1986), in response to severe environmental and public health effects posed by the disposal of hazardous wastes. *See United States v. Hooker Chems. & Plastics Corp.*, 680 F.Supp. 546, 548 (W.D.N.Y.1988). Despite a legislative history "shrouded with mystery," due in large part to CERCLA's enactment as a "last-minute compromise," it is possible to identify two essential purposes behind CERCLA. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1080–81 (1st Cir.1986). As articulated by the court in *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn. 1982),

> First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Id.* at 1112, *quoted in Dedham*, 805 F.2d at 1081.

CERCLA establishes an "array of mechanisms" to achieve its objectives. Relevant here, the Government may take response action whenever there is a release or threatened release of "hazardous substances" and then sue certain persons for reimbursement of the cleanup costs. 42 U.S.C. § 9604. To establish liability, the Government must demonstrate that (1) there has been a "release" or a "substantial threat of release" [2] of a "hazardous substance" [3]; (2) from a "facility" [4]; (3) which caused the Government to incur response costs; and (4) each of the defendants fits within one of the categories of responsible parties identified under § 107(a) of CERCLA. 42 U.S.C. § 9607(a); *CPC Int'l, Inc. v. Aerojet–Gen. Corp.*, 777 F.Supp. 549 (W.D.Mich.1991).

Among the four classes of potentially liable defendants under CERCLA § 107(a) are the current "owner and operator" of the facility, 42 U.S.C. § 9607(a)(1), and any person who at the time of disposal of any

---

**1.** The seemingly mandatory dissertation on the history of CERCLA and the circumstances under which it was enacted shall be omitted here, those topics having been amply chronicled by courts confronting issues arising under the statute. *See, e.g., New York v. Shore Realty Corp.*, 759 F.2d 1032, 1039–1042 (2d Cir.1985).

**2.** A "release" is

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), ...

42 U.S.C. § 9601(22).

**3.** A "hazardous substance" is

> (A) Any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not includ-

ing any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof....

42 U.S.C. § 9601(14).

**4.** A "facility" is defined as

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

hazardous substance "owned or operated" any facility at which such hazardous substances were disposed. *Id.* § 9607(a)(2). These so-called "covered parties" are liable for "all costs of removal or remedial action incurred by the United States or a State not inconsistent with the national contingency plan," if "there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" from the facility. *Id.* § 9607(a)(4).

■■■■ Absent a showing by a preponderance of the evidence that one of the affirmative defenses contained in § 107(b), *id.* § 9607(b), has been satisfied, the liability of covered parties for costs incurred in the clean-up is strict. *B.F. Goodrich Co. v. Harold Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985); *United States v. Monsanto Co.,* 858 F.2d 160, 167 & n. 11 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Where the environmental harm is indivisible, liability is also joint and several. *B.F. Goodrich,* 958 F.2d at 1198; *O'Neil v. Picillo,* 883 F.2d 176, 178–79 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).

Of the defenses available to a defendant otherwise liable under § 107(a), two are relevant here. First, under the "third party defense" set forth in section 107(b)(3), a defendant is not liable if it establishes by a preponderance of the evidence that the release or threatened release was caused by third parties other than those with whom it has a direct or indirect contractual relationship, assuming that the defendant has also exercised due care under the circumstances and has taken precautions against foreseeable acts or omissions by the third parties. 42 U.S.C. § 9607(b)(3). Section 101(35) defines a "contractual relationship" to include "land contracts, deeds or other instruments transferring title or possession." *Id.* § 9601(35).

The second defense relevant in this case is the "innocent purchaser" or "innocent landowner" defense set forth in § 101(35). This defense is applicable if the covered party establishes by a preponderance of the evidence that the requirements of § 107(b)(3)(a) and (b) are satisfied *and* that:

the real property ... was acquired by defendant after the disposal or placement of the hazardous substances on, in or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence: (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in or at the facility....

*Id.* § 9601(35)(A) (emphasis added). Section 101(35)(B) further specifies that:

To establish that a defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry in to the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonable ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

*Id.* § 9601(35)(B).

The Government has moved for summary judgment holding each defendant liable under § 107(a). The Berkman Defendants oppose the motion and cross-move for summary judgment on the ground that they are relieved of liability under either the third party defense or the innocent landowner defense. Marine opposes the Government's motion and cross-moves on the ground that, as a lessee/sublessor of the Property which has never held title to the Property nor participated in or con-

trolled disposal activities, it is not a "covered party" under § 107(a). Marine argues in the alternative that the third party and innocent landowner defenses absolve it of any liability.

## II. *Discussion*

The Court of Appeals for the Second Circuit has recently re-articulated the well-known standard for summary judgment:

> Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party."

*Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (citations omitted). The court will find that there is no genuine issue of material fact and may therefore grant summary judgment where, "[v]iewing the evidence produced in the light most favorable to the nonmovant, ... a rational trier could not find for the non-movant." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *see also Bay*, 936 F.2d at 116. Summary judgment may be an appropriate mechanism for resolving liability issues under CERCLA. *See, e.g., Shore Realty*, 759 F.2d at 1032; *Hooker Chems & Plastics Corp.*, 680 F.Supp. at 551, 556.

It is undisputed that PCE and TCE are "hazardous substances" under CERCLA. It is also undisputed that, at least until 1978, there was a release or threatened release of these substances from the Property. The Government has submitted factual affidavits and studies demonstrating that PCE and TCE are present in the Dry Well and surrounding property. Moreover, it is beyond dispute that A & N disposed of waste water infused with these substances through the floor drain in the Building at least until 1978. The defendants do contend, however, that the release did not cause the Government to incur response costs.

### A. The Release Caused the Government to Incur Response Costs

For CERCLA liability to attach, the plaintiff must prove that there was a release or threatened release "which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(4). To prevail on this component of its motion for summary judgment, therefore, the Government must show that it incurred costs as a result of the release of hazardous substances from the Property.

According to the Government, the demands of this element must be distinguished from a requirement that it prove that the release caused the actual contamination of the Property, which, it maintains, does not exist under CERCLA. In support, the Government cites *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st Cir.1989), in which the court stated that "[t]here is nothing in the statute, its legislative history, or the case law, which requires proof that the defendant's hazardous wastes actually have migrated to plaintiff's property, causing contamination of plaintiff's property, before CERCLA liability is triggered." *Id.* at 1154. Rather, the question is whether the release or threatened release has caused the plaintiff to incur response costs. *Id.* at 1152–53. In that case, the same volatile organic compounds found to have contaminated plaintiff's well field were found in defendant's well and storm drain, into which the defendant's personnel regularly dumped these solvents. These drains were connected to a drainage pipe owned by defendant which discharged directly into a drainage ditch which flowed toward the plaintiff's well field.

In a factually similar case, *Artesian Water Co. v. New Castle County*, 659 F.Supp. 1269 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir.1988), the plaintiff's well field, which drew water from the Upper Potomac Aquifer, became contaminated with groundwater pollution. A report found that leachate from defendant's site had entered the Up-

per Potomac Aquifer and there was "uncontradicted evidence that the threat of contamination from the defendant's site was initially the sole factor, and remained a substantial factor," in the continued contamination of the well field. *Id.* at 1283. Studies indicated that another landfill, located near defendant's, also contained hazardous substances that posed a threat to the Upper Potomac Aquifer.

The court stated that:

> CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a [§ 9607] plaintiff.... [Plaintiff] must therefore show that it incurred costs as a result of the release or threatened release of hazardous substances from the [defendant's] Site.

*Artesian,* 659 F.Supp. at 1282. Nevertheless, in rejecting the defendant's argument that no CERCLA liability could attach absent proof that the contamination would not have resulted "but for" defendant's release, the court held that "if the release or threatened release of contaminants from the Site was a substantial factor in causing [plaintiff] to incur costs, the County may not escape liability merely because other causes contributed to the result." *Id.* at 1283.

The factual submissions establish that PCE and TCE have been detected in the Dry Well and property surrounding it, in A & N's floor drain, and in soil around the Property. It is also undisputed that the Government incurred costs investigating the releases from the Property, and will incur further costs if it follows up on its proposed plan to excavate, contain and decontaminate the Dry Well. Therefore, a causal nexus has been established between the release and the Government's incurrence of response costs satisfying § 107(a)(4).

Nevertheless, due to the bifurcation, the extent of these response costs shall not be addressed. Importantly, the court declines to reach a conclusion as to whether the release from the Property was a substantial factor, or any factor at all, in the Well Field contamination, finding that the defendants have raised triable issues of fact as to this question.[5] Therefore, it remains to be determined whether any costs incurred in connection with the Well Field contamination can be attributed to the defendants.

### B. A & N and Forcucci

The Government contends that A & N and Forcucci are liable under § 107(a)(2) as parties who "at the time of disposal of any hazardous substance ... operated any fa-

---

5. The OU One RI was inconclusive as to whether there was a connection between the releases from the Property and the Well Field contamination. *See* Wing Dec. Ex. A, at 3–48 to 3–49 (investigation revealed no connection between floor drains and storm sewer system, although speculation that if there were discharges to septic tank or Dry Well could cause leaching into groundwater); *id.* at 6–23 (concluding that "investigations at and in the vicinity of Alben Cleaners building did not confirm any direct discharge connections between the building and the on-Site storm water collection system"); *id.* ("If past disposal practices included discharging wastes into their on-site septic system or dry well, as results of the RI indicate, contamination of the adjacent aquifer is *likely.* Under influence of Well Field pumping groundwater from this location *could* be drawn toward the Well Field making Alben Cleaners a *likely* source of the contamination." (emphasis added)).

While the OU Two RI concluded that "the Alben Cleaners dry well was identified as a

significant source of VHO contamination," Wing Dec. Ex. B. at 64, the defendants have cast uncertainty on this conclusion in the form of an affidavit by Glenn T. Wygant, a Manager of ERM–Northeast, Inc. and geologist who is responsible for reviewing, evaluating and commenting on various remedial investigation studies performed on sites located in New York State. Mr. Wygant avers that the data and conclusions in the OU One and OU Two RI's and Feasibility Studies by the EPA do not establish that the Dry Well is a source of the groundwater contamination at the Well Field. He attacks the methodology and substantive conclusions of these investigations, relating, among other things, to concentrations, groundwater flow and the position of the Dry Well contamination in the aquifer.

Drawing all inferences in favor of the parties opposing the motion for summary judgment, therefore, the court declines to draw what, according to the Government, is "the only logical conclusion ... that the drywell is a significant source of contamination at the Well Field." Wing Reply Dec. ¶ 8.

cility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). None of the facts raised negates the conclusion that, at least prior to 1978, A & N and Forcucci disposed of water infused with PCE and TCE down the floor drain of the Building. Therefore, except as provided in Part II.A., *supra*, the Government's motion for summary judgment as to the CERCLA liability of A & N and Forcucci is granted.

## C. The Berkman Defendants

The Government asserts that the Berkman Defendants are liable under § 107(a)(1) and (2) as the current and past owners of the Property. In opposition, and on their cross-motion, the Berkman Defendants counter that they are relieved of liability under the third party defense because they do not have a contractual relationship with A & N and/or Forcucci. Furthermore, they claim that they meet the requirements of the innocent landowner defense.

There being no dispute that the Berkman Defendants are covered parties under § 107(a)(1) as the current owners of the Property, it remains only to determine whether they have satisfied either of these defenses.

### 1. Third Party Defense

To prevail on the third party defense, the Berkman Defendants must establish by a preponderance of the evidence that: (1) a third party was the sole cause of the release; (2) that third party was not their employee or agent or one with whom they had a direct or indirect contractual relationship; (3) they exercised due care with respect to the hazardous substance; and (4) they took precautions against the foreseeable acts or omissions of the party causing the release. 42 U.S.C. § 9607(b)(3).

The Government does not dispute that the Berkman Defendants did nothing to contribute to the release and thus that the activities of third parties were the "sole" cause of the release. The Government maintains, however, that the third party defense is unavailable to the Berk-

man Defendants because they had an "indirect" contractual relationship with A & N by virtue of A & N's sublease from Marine. Furthermore, the Government argues that the Berkman Defendants did not exercise due care or take precautions with respect to the release of the hazardous substances.

### a. Contractual Relationship

It is well-established that a lease constitutes a "contractual relationship" under § 107(b)(3). *See id.* § 9601(35)(A) ("contractual relationship" for purposes of § 107(b)(3) includes land contracts, deeds or other instruments transferring title or *possession* (emphasis added)); *International Clinical Labs., Inc. v. Stevens*, 710 F.Supp. 466, 470–71 (E.D.N.Y.1989); *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 748 (W.D.Mich.1987); *United States v. Argent Corp.*, 14 E.L.R. 20616, 20616, 1984 WL 2567 (D.N.M.1984). Nevertheless, because no "lease" has ever existed between the Berkman Defendants and A & N, it is necessary to inquire as to whether the Berkman Defendants' status as lessor to Marine, A & N's lessor, gives rise to an "indirect" contractual relationship between the Berkman Defendants and A & N.

A sublease may constitute a direct or indirect contractual relationship between an owner and its lessor's sublessee under certain circumstances. In *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), the Fourth Circuit held that two site-owners had not established the absence of a direct or indirect contractual relationship with the sublessee ("SCRDI"), the party causing the release, in part because they had accepted rent payments from SCRDI. *Id.* at 167.

In *O'Neil v. Picillo*, 682 F.Supp. 706 (D.R.I.1988), generators of hazardous wastes ultimately disposed of at the contaminated site argued that the release had to have been caused solely by third parties for whom they had no responsibility, claiming that the licensed waste transporters to whom they had consigned their wastes had no contact with the contaminated site. *Id.* at 728. The court rejected the defendants' argument, however, finding that:

The simple fact is that during the time the defendants consigned their waste to licensed disposers, some of that waste, in identifiable containers, came to rest at the Picillo site.... The defendants must demonstrate by a preponderance of the evidence that "a totally unrelated third party is the sole cause of the release." [*United States v.] Stringfellow*, 661 F.Supp. [1053, 1061 (C.D.Cal.1987)].... Absent any evidence along these lines, I must concluded that it is equally likely that either the licensed disposers *or a subcontractor of the disposers* deposited the waste at the site.

*Id.* (emphasis added).

And, in *Washington v. Time Oil Co.*, 687 F.Supp. 529 (W.D.Wash.1988), the court denied a motion for summary judgment by the defendant landowner, Time Oil, based on the innocent landowner defense.[6] The court found that because Time Oil's subsidiary was also responsible for the contamination of the property, Time Oil had failed to establish that the release was caused *solely* by a third party for whom it was not responsible. *Id.* at 532. Though this finding alone precluded Time Oil from invoking the defense, the court also stated in *dictum* that:

The last operator on the property was *Time Oil's sublessee*, Drexler. As mentioned above, the Court is satisfied *Drexler was in an indirect contractual relationship with Time Oil*. It is clear that if the Court concludes that the waste oil and other substances handled by Drexler contained the hazardous substances later found on the property, Time Oil will be liable for the harm caused by Drexler's operation.

*Id.* at 532–33 (emphasis added).

Each of these cases is distinguishable from the instant factual scenario, however. In *Monsanto*, for instance, the owners received a direct financial benefit from the

sublessee, presumably in lieu of the lessee's payment of rent under its lease with the owners. In *Picillo*, it is apparent that, in disposing of the generator's waste, the hypothetical "subcontractors" would simply have been executing the duties which the waste transporters owed to the generator of the waste. In these cases, a flow of benefits or obligations between the "owner" and the "subparty" is distinctly discernible. *Cf. CPC Int'l*, 777 F.Supp. at 581 (acquisition of site from bankruptcy trustee of party responsible for contaminating site constitutes "indirect contractual relationship" between debtor and purchaser).

No such relationship exists between the Berkman Defendants and A & N. There has been no allegation, for instance, that the Berkman Defendants, like the defendant in *Monsanto*, received rent from A & N, either directly or through Marine. *Cf.* Marine Lease, Berns Dec. Ex. A, ¶ 18 (Marine obligated to pay rent on entire Property regardless of subleases). And, unlike the "subcontractors" in *Picillo*, A & N was not fulfilling Marine's obligations to the Berkman Defendants by occupying the premises and operating its business. Finally, though *Time Oil* may not be technically distinguishable, the opinion does not provide sufficient facts or reasoning to lend meaning to its conclusion that an indirect contractual relationship existed between Time Oil and the sublessee.[7]

Common law provides some support for the conclusion that, on the facts of the instant dispute, no contractual relationship exists between A & N and the Berkman Defendants. As stated in *Tefft v. Apex Pawnbroking & Jewelry Co.*, 75 A.D.2d 891, 428 N.Y.S.2d 52 (2d Dept.1980), no privity of contract exists between the owner of a building and its lessee's subtenant. As such, a subtenant is not directly liable to the original lessor for performance of the covenants contained in the original

---

**6.** Although the court states that Time Oil raised this defense, it is apparent from the opinion that it was actually the third party defense that was in issue.

**7.** For instance, it is unclear whether Time Oil's subsidiary was the original lessor who then sub-

let the premises to Drexler. In light of the court's imputation of the subsidiary's disposal activities to Time Oil, a lease between the subsidiary and Drexler would necessarily translate into a contractual relationship between Time Oil and Drexler.

lease and the original lessor may not maintain an action against the subtenant for breach of the lease. *Id.* Rather, the original lessee remains liable to his lessor notwithstanding a subletting of the premises. A sublease creates a "new and ... separate contractual relationship between the original lessee and the sublessee.... there are two contracts, the original lease and the sublease, only the original lessee is a party to both." *Mire v. Sunray DX Oil Co.*, 285 F.Supp. 885 (W.D.La.1968). Even after the expiration of the main lease, the subtenant continues as the statutory tenant of the main tenant, not of the owner-landlord. *214 West 39th Street Corp. v. Miss France Coats, Inc.*, 274 A.D. 597, 598–600, 84 N.Y.S.2d 818, 820–22 (1st Dept. 1948).

The court is not persuaded by the Government's argument that an indirect contractual relationship may be implied because the Berkman Defendants could have affected A & N's activities by (1) enforcing its lease with Marine, which, among other things, required Marine to comply with all governmental requirements; (2) by requesting Marine to take action, such as maintenance action with respect to the Property; and (3) because they were "well-acquainted personally with the subtenants and discussed maintenance problems with them from time to time when the owners were conducting business at the Property." Government Memo. in Opp. at 24 & nn. 11–12. Any authority held by the Berkman Defendants related solely to Marine. On these facts, a contractual relationship between the Berkman Defendants and A & N does not ensue simply because the exercise of that authority may have affected A & N at some point, assuming that Marine chose to comply with the Berkman Defendants' requests. Finally, no contractual relationship springs from the mere fact that the Berkman Defendants were acquainted with Marine's subtenants and occasionally chatted about maintenance problems, which all concerned understood Marine had the responsibility to remedy.

### b. Due Care and Precautions

■ Having concluded that no contractual relationship existed between the Berkman Defendants and A & N, the Berkman Defendants must also show that they exercised due care and took precautions with respect to the release. Specifically, for a party to prevail on the third party defense, § 107(b)(3) requires that

(a) he exercised *due care* with respect to the hazardous substance concerned, *taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances,* and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could *foreseeably* result from such acts or omissions.

42 U.S.C. § 9607(b)(3) (emphasis added).

The Government contends that the Berkman Defendants neither exercised due care nor took adequate precautions in light of the following undisputed facts: (1) the Berkman Defendants were at all times aware that A & N conducted a dry cleaning business, Berkman Dep., Berns Reply Dec. Ex. G, at 78, 85, 87; Petrillo Dep., Berns Reply Dec. Ex. F, at 12; (2) they were aware of the PCDH's September 1978 notice to Brewster residents advising of possible contamination at the Site and of the need to boil drinking water; (3) local newspapers published articles during 1978 and 1979 discussing the Well Field contamination and describing the source of the contamination as "tetrachloroethylene—commonly used as a spot remover or solvent;"[8]

---

**8.** That article appeared in *The Reporter Dispatch* on September 27, 1978. Additional articles raised the link between PCE, TCE and dry cleaning establishments. For example, on November 20, 1979, an article in *The Reporter Dispatch* stated that "the chemical, known as TCE.... is commonly used as a grease solvent or spot remover by dry cleaners and auto mechanics." Another article, appearing on April 2, 1979, reported that "the chemical, a degreaser, is used

primarily by dry cleaners as a solvent." These articles and others are contained in Exhibit E to the Berns Reply Declaration.

Additionally, a Putnam County Department of Health News Release, which, though undated, is assumed to have been published in November 1979, stated that after some test drilling "[t]he results indicate that the contamination may have originated from one or more of the com-

and (4) in December 1979, Berkman gave the Village of Brewster permission to perform borings on the Property "for the purpose of determining the source of contamination of the Village well fields." Berns Reply Dec. Ex. D. It is undisputed that the Berkman Defendants did not inquire as to the waste disposal activities of any of its subtenants until 1988, when they were contacted by the EPA.

According to the Government, the Berkman Defendants' failure to exercise due care began when they purchased the Property without inquiring into the use of the floor drain or of the waste disposal practices of A & N, without communicating with state and local health and environmental agencies, and without inquiring as to whether the commercial tenants on the Property were in violation of any environmental laws.

■ The submissions reveal triable issues of fact as to whether the pre-purchase inquiries undertaken by the Berkman Defendants satisfy the due care requirement, *see* Part C.2 *infra*. However, unlike the innocent landowner defense,[9] the language of the due care/precautions requirement of the third party defense is not temporally limited to the time of acquisition. Accordingly, it must be inferred that due care must be exercised throughout the period of ownership or operation.

The due care/precautions requirement clearly contemplates some degree of awareness by the defendant of the potential for release of a hazardous substance: it is hard to fathom how a defendant could take due care "taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances," or take precautions against "*foreseeable* acts or omissions of any third party" if it is unaware that any

mercial establishments located in the highly developed area surrounding the intersection of Routes 22 and 6." Berns Dec. Ex. D; *see also Courier* article dated November 21, 1979, Berns Reply Dec. Ex. E, reporting that the source of contamination had been narrowed to "commercial establishments located in the highly developed area surrounding the intersection of Routes 22 and 6 in Brewster."

hazardous substance is being used or disposed of. *Cf. Shore Realty,* 759 F.2d at 1049 (defendant failed on third party defense where it was "aware of the nature of the tenants' activities before the closing and could readily have foreseen that they would continue to dump hazardous waste at the site").

The court is satisfied that, given the newspaper articles, Berkman's consent to have the Village of Brewster take borings on the Property "for the purpose of determining the source of contamination of the Village well fields," and the extent of investigative activity that apparently was taking place at the Property, the Berkman Defendants were sufficiently aware that they should have made inquiry of the various subtenants.

Nevertheless, as to the period spanning from the purchase to the present, there are also triable issues of fact as to whether the Berkman Defendants exercised due care and took precautions consistent with the third party defense. Primarily, there is a factual question as to what care was due under the circumstances, which necessarily depends on the answer to the disputed question of what the circumstances were. If, for instance, Forcucci indeed did cease his disposal activities as of 1978, as he informed the Berkman Defendants in 1988, *see* Part C.2 *infra*, it is unclear what action or precautions the Berkman Defendants should have taken.

For these reasons, the Berkman Defendants' motion for summary judgment is denied.

### 2. The Innocent Purchaser Defense

■ In addition to requiring satisfaction of the requirements of § 107(b)(3), the innocent purchaser defense requires that the defendant have acquired the property after

9. Section 101(35) provides that to invoke the innocent purchaser defense, "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance ... was disposed of...." 42 U.S.C. § 9601(35).

the release occurred and that it did not know and had no reason to know that any hazardous substance had been released at that facility. 42 U.S.C. § 9601(35)(A).

A triable issue of fact exists as to the date after which A & N ceased disposing of contaminated wastes down the floor drain. Forcucci has testified that he ceased disposing of waste water down the floor drain in 1978. Forcucci Dep., Wright Aff. Ex. C, at 80–81. However, Forcucci has also given conflicting information to the EPA[10] and, according to Louis Esposito, Marine's Fire Safety Officer until 1990, informed Mr. Esposito in 1988 that he disposed of waste liquids down the drain "prior to 1983." Esposito Dec., Berns Third Dec. Ex. A, at ¶ 6. Furthermore, the OU Two RI states that, as of December 1985, "condensation water from the ironing machine shows PCE at 117 ppb. A sample of water from the drain ... contained PCE at only 6.6 ppb." Wing Dec. Ex. A, at 3–49. This conflicting data thus presents a question for the trier of fact as to whether the Berkman Defendants' purchase of the Property in 1979 post-dated the disposal.

Additionally, the Berkman Defendants have raised a triable issue of fact as to whether they "had no reason to know ... [having] undertaken, *at the time of acquisition, all appropriate inquiry* in to the previous ownership and uses of the property *consistent with good commercial or customary practice....*" 42 U.S.C. § 9601(35)(B) (emphasis added). The Government contends that under this standard the Berkman Defendants should have inquired into the disposal activities of A & N, the use of the floor drain, whether commercial tenants on the Property were in violation of environmental laws, and should have communicated with state and local health and environmental agencies.

While conceding that the level of inquiry undertaken may not be consistent with "good commercial or customary practice" *today,* the Berkman Defendants have submitted the affidavit of Vincent Ficarra, a New York realtor, who attests that the level of inquiry undertaken by the Berkman Defendants prior to purchasing the Property constituted good commercial practice in 1979.

Section 101(35)(A) provides that satisfaction of the requirements set forth in § 107(b)(3)(a) and (b) must be established for a party to prevail on the innocent landowner defense. *See* 42 U.S.C. § 107(b)(3)(a) and (b) (due care and precautions requirement). As discussed above, issues of fact remain to be tried on the Berkman Defendant's satisfaction of those requirements. Therefore, the Berkman Defendant's motion for summary judgment is denied.

### D. Marine Midland

■ The Government contends that Marine is liable under §§ 107(a)(2) as the "owner and operator" of a facility at the time of the release. Although it is undisputed that Marine has never held title to the Property or any part thereof, the Government asks the court to rule that a lessee of property that maintains control over and responsibility for the property from which the release took place is an "owner" for purposes of CERCLA. Marine counters that, absent a showing that a lessee/sublessor has engaged in disposal activity or exercises control over that activity, it cannot be held liable under CERCLA as an "owner." Furthermore, Marine argues that it did not exercise the requisite control over A & N's disposal operations to be considered an "operator." Marine thus

---

**10.** The EPA's Supplemental Request for Information Under 42 U.S.C. § 9604(e) posed the following question to Forcucci:

> Were dry cleaning wastes or any other substances ever disposed of or discharged by Alben Cleaners or any of its employees or agents into the drywell located adjacent to the premises currently occupied by Alben Cleaners? If so, describe in detail (i) the nature and quantities of such wastes or other substances, (ii) the dates of such disposal or discharge, (iii) the location of the disposal or discharge (*e.g.,* into a drain or pipe), and (iv) the names of the persons who performed such disposal or discharge.

Rehm Dec. Ex. B, at 4, # 6.a.

Forcucci responded: "Yes. Water from separator of dryer. 1965–1983. Drain in hallway at rear of store. Ben Forcucci." *Id.* at 3, # (6–a).

cross-moves for summary judgment declaring that it is not a covered party under § 107(a). In the alternative, Marine moves for summary judgment dismissing the complaint against it on the grounds that it is relieved of liability under either the third party defense or the innocent landowner defense.

### 1. Marine's § 107(a) Liability

A party need not be both an owner and an operator to be liable under § 107(a); either status is sufficient to establish CERCLA liability. *See, e.g., United States v. Maryland Bank & Trust*, 632 F.Supp. 573, 577–78 (D.Md.1986); *Shore Realty*, 759 F.2d at 1044. The terms "owner and operator" are defined in § 101(20) of CERCLA as "any person owning or operating a facility." 42 U.S.C. § 9601(20)(A). While the circularity of this definition necessarily precludes its use as an interpretive device, courts generally resolve ambiguities in CERCLA's language in favor of imposing the most expansive liability, citing the statute's remedial purpose. *See, e.g., Dedham*, 805 F.2d at 1081; *Shore Realty*, 759 F.2d at 1045 (court "will not interpret section 9607(a) in any way that apparently frustrates [CERCLA's] goals, in the absence of a specific congressional intention otherwise"); *Maryland Bank & Trust*, 632 F.Supp. at 578–79. At the same time, however, the court is mindful of the Supreme Court's directive that a remedial purpose alone is not sufficient "to add a gloss to the operative language of the statute quite different from its commonly accepted meaning." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198–99, 96 S.Ct. 1375, 1383–84, 47

L.Ed.2d 668 (1976) (regarding § 10(b) of Securities Exchange Act of 1934; concluding that use of words "manipulative," "device" and "contrivance" "make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence").[11]

Despite the disjunctive nature of the terms "owner" and "operator" under the statute, some courts have resisted defining the terms separately, preferring instead to define the conjunctive term "owner-operator." In *CPC Int'l, Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783 (W.D.Mich.1989), for example, the court articulated the following test:

> The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the *degree of control that party is able to exert over the activity causing the pollution.* Other district courts have reached this conclusion by borrowing the definition of "owner-operator" as used in the Federal Water Pollution Control Act, 33 U.S.C. § 1321(a)(6).... That definition is:
>
> > The owner-operator of a vessel or vacility [sic] has the capacity to make timely discovery of oil discharges. *The owner-operator has power to direct the activities of persons who control the mechanisms causing the pollution. The owner-operator has the capacity to prevent and abate the damage.*

*Id.* at 788 (citations omitted; emphasis added); *see also Idaho v. Bunker Hill Co.*, 635

---

**11.** The Government cites the legislative history as evidence of Congress's intent that the term "owner" be construed to include individuals and entities other than those actually holding title. House Report 96–172, which accompanied the first draft of the Comprehensive Oil Pollution Liability and Compensation Act, one of the four major bills out of which CERCLA emerged, contains the following definition of "owner" proffered by the Committee on Merchant Marine and Fisheries:

> "Owner" is defined to include not only those persons who hold title to a vessel or facility but *those who, in the absence of holding a title, possess some equivalent evidence of ownership.*

*reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Vol. 2, at 546 (emphasis added), *cited in Maryland Bank & Trust Co.*, 632 F.Supp. at 579–80.

As this definition was rejected in the enacted version of the statute, however, it can hardly be said to put flesh on the bare bones provided. It seems equally plausible to infer that, Congress having excised the underscored language, it intended that the terms be given their ordinary meaning. *See Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir.1988) (circularity of definition implies that "owner and operator" have ordinary meanings).

F.Supp. 665, 672 (D.Idaho 1986) (parent corporation was "owner-operator" of property owed by subsidiary where parent "was in a position to be, and was, intimately familiar with hazardous waste disposal and releases at the Bunker Hill facility; had the capacity to control such disposal and releases; and had the capacity, if not total reserved authority, to make decisions and implement actions and mechanisms to prevent and abate the damage caused by the disposal and releases of hazardous wastes at the facility."). However, because an "owner" may be liable without being an "operator," and vice versa, this test is not sufficiently precise to define the separate terms.

### Marine Was an "Owner" Subject to Liability Under § 107(a)(2)

■ In contrast to the "owner-operator," as defined by the cases cited above, an "owner" under CERCLA need not have any control over the disposal activity. Mere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack or control over the disposal activities. *See, e.g., Monsanto*, 858 F.2d at 169 (site owners liable regardless of degree of participation in disposal of hazardous wastes); *Argent Corp.*, 14 E.L.R. at 20616 (mere ownership of land and building from which owner's lessor released hazardous substances sufficient to support liability as "owner"; participation in management or operation of business causing release not a prerequisite to owner liability); *United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 993 (D.S.C.1984), *aff'd sub nom. United States v. Monsanto*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (property owners Hutchinson and Seidenberg held liable under § 107(a)(2) merely by virtue of "ownership of the ... property [and disposal of] hazardous substances ... on the property during their period of ownership"). *Nurad, Inc. v. William E. Hooper & Sons*, No. WN 90–661, slip op. at 25–26 (D.Md. Aug. 15, 1991) (officer and principal shareholder of corporation that formerly owned property is an owner even though not involved in managing hazardous substances handled by tenants and unable to control tenant's activities; "it is clear that absentee landlords can be held liable under Section 107(a)(2) of CERCLA as prior owners at the time of disposal even though they have not participated in conduct resulting in the release of hazardous substances."). The relevant inquiry is, then, what constitutes "ownership" in the absence of title?

The one court to address the question of the ownership status of a lessee/sublessor found that party to be an "owner" under § 107(a) using the following definition:

As evidenced by the definitional provisions of CERCLA, *site control is an important consideration in determining who qualifies as an "owner" under Section 107(a)*. Accordingly, site lessees like COCC should, along with the property owners themselves, be considered "owners" for purposes of imposing liability under Section 107(a). To conclude otherwise would frustrate Congress's intent that persons with responsibility for hazardous conditions bear the cost of remedying those conditions.

*United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984, 1003 (D.S.C.1985) (hereinafter *"SCRDI"*) (emphasis added), *aff'd sub nom. United States v. Monsanto*, 858 F.2d 160 (4th Cir. 1988).[12] "Site control" in this case meant that the lessee/sublessor "as lessee of the site, maintained *control* over and *responsibility* for the *use* of the property and, essentially, stood in the shoes of the prop-

---

12. In *SCRDI*, Columbia Organic Chemical Company ("COCC") was the lessor of certain property pursuant to a verbal lease. During its leasehold, COCC entered into a verbal sublease with South Carolina Recycling and Disposal, Inc. ("SCRDI"), which conducted hazardous waste operations on the property, leading to the release of hazardous substances. The United States, the plaintiff, moved for summary judgment as to the liability of SCRDI, COCC and others. The court found that COCC was liable as either an "owner" or an "operator" of the site, as well as a "generator" under § 107(a)(3) and as a "transporter" under § 107(a)(4). *SCRDI*, 653 F.Supp. at 1003–06.

erty owners." *Id.* at 1003 (emphasis added).[13] That COCC had subleased a portion of the property to which it held a leasehold strengthened the case against it as an owner. "As a general rule," the court wrote, "a lessor or sublessor who allows property under his control to be used by another in a manner which endangers third parties or which creates a nuisance, is, along with the lessee or sublessee, liable for the harm." *Id.*

The undisputed facts establish that Marine exercised a degree of site control over the Property, that, under this definition, confers ownership status upon it for purposes of CERCLA § 107(a).

From 1970 through 1990, Marine leased the entire Property, first from Six & Twenty Two, and subsequently from the Berkman Defendants. Under the Marine Lease, which remained in effect over that period of time, Marine assumed obligations and acquired rights with respect the Property that, when considered with the actual course of conduct that ensued, placed it in the shoes of "owners." The Marine Lease gave Marine the right to sublet all or part of the Property, Berns Dec. Ex. A, ¶ 13, and to evict tenants, Marine Response to Government's 3(g) Statement ¶ 15. Marine was not obligated to notify the Berkman

Defendants when such events took place. Berkman Dep., Berns Reply Dec. Ex. F, at 115. At the same time as Marine's use of the Property was not limited, Marine Lease, Berns Dec. Ex. A, at ¶ 5, Marine had the discretion to determine the use of the Property by its subtenants. For instance, the Pircio's Lease and the 1982 Lease clearly provide that the premises occupied by A & N were to be used as a dry cleaning establishment.[14] Marine had the authority to collect all rents from existing tenants on the Property and to enforce all obligations of those tenants under their leases. Marine Lease, Berns Dec. Ex. A, at ¶ 8; *see also* Glanville Aff. Ex. F (Marine letter to Pircio's notifying it to make all rent payments to Marine "as your new landlord").

Marine was obligated to keep the entire premises in good condition and repair at all times, Marine Lease, Berns Dec. Ex. A, at ¶ 12, to comply with all governmental rules and regulations for the correction, prevention and abatement of nuisances, *id.* at ¶ 16, and to perform all of its obligations under the Marine Lease, including the payment of rent, regardless of any subleases or assignments. *Id.* ¶ 18.

Marine in fact did exercise responsibility for maintenance and repair of the Property.[15] *See* Berns Dec. Exs. J, K. It main-

---

**13.** *See also Developments in the Law—Toxic Waste Litigation,* 99 Harv.L.Rev. 1458 (1986). Synthesizing the case law, the authors of this article conclude that "[o]ne may be an 'owner,' without possessing legal title to a site, if one had authority to determine how the land was *to be used.*" *Id.* at 1514 (emphasis added).

Control over the *property* as the definitional characteristic of ownership should be contrasted to the factors considered by the *SCRDI* court in holding that COCC was an "operator," namely that COCC was generally involved in the hazardous waste disposal business; one of the officers of SCRDI, COCC's sublessee, had apparent authority to act on behalf of COCC; and COCC was a "joint venturer" with SCRDI, making it vicariously liable for acts undertaken by SCRDI's agents. *SCRDI,* 653 F.Supp. at 1003–05.

Indeed, state law cited by Marine, addressing the requisite degree of control a landlord must exercise over leased property to be liable in tort to third parties injured on those premises, provides an analogy that supports the "control over the property" definition of ownership. In *De Clara v. Barber S.S. Lines,* 309 N.Y. 620, 132 N.E.2d 871 (1956), the New York Court of Appeals held that the requisite degree of control

existed where the landlord had reserved the right to enter, inspect and repair in his discretion, and had maintained a crew to guard, police, inspect and repair the premises. The court noted that "[i]ndeed, such control [has been found to exist] in an act of repair made by the landlord after the accident, even though the primary duty of repair rested upon the tenant." *Id.* at 628–29, 132 N.E.2d at 875–76.

**14.** Other subleases likewise specify the use to which the subleased premises were to be put. *See, e.g.,* Berns Dec. Ex. H (Marine sublease to Brady and Standard Chevrolet Cadillac Group; specifies that premises are to be used and occupied for "the maintenance and repair of automobiles").

**15.** Among other things, Marine repaired a metal storm sewer grate and potholes in the parking lot, removed heating units from the tenant areas of the garage, restored the roof on the Building, installed a new boiler, arranged to have the septic tank pumped out, closed holes in the basement ceiling to comply with fire codes, and formulated a contingency plan in 1989 for main-

tained a Real Estate Department and a Facilities Department through which it inspected and maintained Marine's real estate, including the Property. Berns Dec. Ex. K. It employed a Safety Officer who was authorized to investigate activities on the Property and report to Marine. Esposito Dec., Berns Third Dec. Ex. A, at ¶ 2. According to the declaration of Louis Esposito, Marine's Safety Officer from 1988 through 1990, the duties of that position included "all fire safety, health and safety of the Marine Midland employees, the training of fire wardens, investigation of complaints of foul air in the workplace, investigation of accidents ... and *environmental matters* referred to [him] by the Facilities Department ... of Marine Midland." *Id.* Contrary to Marine's contention that its responsibilities related only to exterior and common areas of the Building, Marine also had the authority to investigate and repair the interiors of the sublet premises. *See* Pircio's Lease, Glanville Aff. Ex. E, at ¶ 13 ("Landlord or Landlord's agents shall have the right to enter the demised premises at all times to examine the same ... and to make such decorations, repairs, alterations, improvements or additions as Landlord may deem necessary or desirable.... Landlord or Landlord's agents may enter [the premises] by a master key or may forcibly enter the same."); 1982 Lease, Berns Dec. Ex. D, at ¶ 13 ("Owner [Marine] or Owner's agents shall have the right but shall not be obligated to enter the demised premises in any emergency at any time, and, at other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable ... for purpose of complying with laws, regulations and other directions of governmental authorities."). Marine in fact exercised this authority, when, for instance, Esposito investigated A & N and another subtenant after Marine was notified by the EPA that there had been dumping of envi-

ronmental contaminants from the Property. *See* Berns Reply Dec. Ex. D; *id.* Ex. R; Glanville Supp.Aff. Ex. A.

Moreover, the Berkman Defendants and Marine's subtenants looked to Marine as the party exercising control over the use and maintenance of the Property. The individual owners of the Property regularly contacted Marine Midland with problems concerning the Property. *See* Petrillo Dep., Berns Reply Dec. Ex. F, at 25–28; *id.* at 24 (Petrillo instructed Forcucci to contact Marine regarding leaking roof, which Forcucci had already done); Berkman Dep., Berns Reply Dec. Ex. G, at 25–29 (if there was a problem, he would call branch manager or real estate department of Marine); *id.* at 96–97 (Marine was "responsible for everything. We had nothing to do with the building"). Appended to the Berns Declaration and Reply Declaration are letters from the Berkman Defendants requesting that Marine address itself to certain maintenance problems, including an electric box, leaking roof, discharge by a subtenant of contaminants in the area around the bank and potholes in paved areas around Property, Berns Reply Dec. Ex. C, as well as requests that Marine repair parking lot lamp posts and roof. Berns Dec. Ex. K. One subtenant threatened a lawsuit against Marine for alleged water damage to merchandise due to the leaking roof. *Id.*

With the exception of the power of alienation, therefore, Marine enjoyed the rights and bore the obligations of an "owner" as the term is commonly understood. For this reason, Marine is liable as an "owner" under CERCLA § 107(a)(2). Having concluded that Marine was an owner, it is not necessary to determine whether Marine was also an "operator."

### 2. The Third Party Defense

■■ The lease agreement between Marine and A & N constitutes a direct contractual relationship.[16] This finding is not dis-

---

placement of the dry well since neither the Berkman Defendants nor the United States had made such arrangements. Berns Dec. Exs. J, L.

**16.** Marine claims that no such relationship existed prior to 1982 when Marine and A & N

entered into the 1982 Lease. Prior to that time, in effect was the Pircio's Lease, subject and subordinate to which Marine leased the Property. Notwithstanding the original parties to the Pircio's Lease, however, Marine did have a con-

positive of the availability of the third party defense to Marine, however. The Second Circuit has recently held that:

> The mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed and a third party whose act or omission was the *sole* cause of the release or threatened release of such hazardous substances into the environment does not foreclose the owner of the land from escaping liability.... In order for the landowner to be barred from raising the third-party defense under such circumstances, the contract between the landowner and the third party must either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's activities.

*Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89, 91 (2d Cir.1992) (emphasis in original). In *Westwood,* the court held that a prior owner of property was not precluded from invoking the third party defense by a land sale contract with the party responsible for the release. On the other hand, the "classic scenario" in which a defendant would be barred is that of a landowner who contracts with a third party to operate a landfill. *Shapiro v. Alexanderson,* 743 F.Supp. 268 (S.D.N.Y.1990).

The contract between Marine and A & N relates to hazardous substances. Both the Pircio's Lease and the 1982 Lease specifically provide that the premises are to be used for a dry cleaning establishment. A & N used hazardous substances as a matter of course in conducting its business. Thus, "the contract between the landowner and the third party somehow is connected with the handling of hazardous substances," *Westwood,* 964 F.2d at 89, making the third party defense unavailable to Marine.

### 3. The Innocent Purchaser Defense

■ The innocent purchaser defense likewise is unavailable to Marine. As discussed above, this defense requires that the defendant have acquired the property subsequent to the release or disposal activity. It is undisputed that Marine entered into the Marine Lease for the entire Property in 1970 and that A & N's disposal activity continued at least until 1978. Marine contends, nevertheless, that it cannot be considered the "owner" of the Dry Well until 1982, when it entered into the 1982 Lease with A & N. Prior to that time, claims Marine, ownership of the Dry Well cannot be imputed to it because under the Pircio's Lease, Pircio's/A & N was "to maintain and repair the pump and cesspool or dry well presently located on the premises of which the herein demised premises are a part; which said pump and cesspool or dry well provide water for and collect waste from the demised premises." Pircio's Lease, Glanville Ex. E, at ¶ 43. Marine maintains that it is therefore an innocent purchaser because A & N had ceased its disposal activities prior to 1982.

Even assuming that A & N did cease its disposal activities prior to 1982, Marine cannot invoke the innocent purchaser defense because it acquired the Property, including the Dry Well, in 1970 when it entered into the Marine Lease. The Marine Lease conveyed to Marine possession of the entire Property, and made no exception for the Dry Well. Under CERCLA, an owner or operator cannot contract away its responsibility for purposes of CERCLA liability. *See* 42 U.S.C. § 9607(e)(1) ("No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility ... to any other person the liability imposed under this section."); *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1442 (N.D.Ind.1990). Thus, Marine's motion for summary judgment based on the innocent purchaser defense is denied.

---

tractual relationship with A & N as of 1970: Marine was assigned all of Six & Twenty Two's rights under that lease, directly renewed the lease twice, and in 1971 informed Pircio's/A & N to make all rent payments to Marine "as your new landlord." Glanville Aff. Ex. F.

1336

### Conclusion

For the foregoing reasons, the Government's motion for summary judgment as to the CERCLA liability of A & N and Forcucci, the Berkman Defendants and Marine is granted. The motion by the Berkman Defendants for summary judgment dismissing the claims against them based on the third party and innocent purchaser defenses is denied. Marine's motion for summary judgment dismissing the claims against it on the grounds that it is not a covered party under CERCLA § 107(a), or, in the alternative, that it is absolved of liability under the third party or innocent purchaser defenses is denied. Triable issues of fact remain as to the affirmative defenses interposed by the Berkman Defendants.

It is so ordered.