UNITED STATES of America, Plaintiff,

v.

A & N CLEANERS AND LAUNDERERS, INC., Ben Forcucci, Marine Midland Bank, N.A., Jordan W. Berkman, John A. Petrillo, Joseph Curto and Mario Curto, Defendants.

MARINE MIDLAND BANK, N.A., Third–Party Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, St. Paul Mercury Insurance Company, Utica Mutual Insurance Company, the North River Insurance Company and United States Fire Insurance Company, Third–Party Defendants.

MARINE MIDLAND BANK, N.A., Third–Party Plaintiff,

v.

VILLAGE OF BREWSTER, Third–Party Defendant.

No. 89 Civ. 6865 (RWS)

United States District Court, S.D. New York.

May 26, 1994.

ing, although the employer was not obligated to provide benefits if plaintiff resigned.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City (Sara L. Shudofsky, Asst. U.S. Atty., of counsel), for U.S.

G. Oliver Koppell, Atty. Gen. of the State of N.Y., New York City (Robert Emmet Hernan, Asst. Atty. Gen., of counsel), for plaintiff-intervenor.

Edwards & Angell, New York City (Lynn Wright, Susan S. Egan, Christopher Heyer, of counsel), for defendants Jordan W. Berkman, John A. Petrillo, Joseph and Mario Curto.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY (Robert E. Glanville, of counsel), for defendant Marine Midland Bank.

SWEET, District Judge.

Plaintiff United States of America (the "Government") brought this action to hold defendants Jordan W. Berkman ("Berkman"), John A. Petrillo ("Petrillo"), and Joseph and Mario Curto (the "Curtos") (collectively, the "Berkman Defendants") liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675, for costs incurred and to be incurred by the Government at the Brewster Wellfield Site (the "Well Field" or "Site") in Putnam County, New York, and elsewhere, in response to a release or threatened release of hazardous substances from real estate owned by the Berkman Defendants located at the intersection of Routes 6 and 22 in the Town of Southeast, Putnam County, New York (the "Property").

From April 1 to April 4, 1994, this Court held a hearing on the question of the Berkman Defendants' right to claim the protections of the statutory affirmative defenses set forth in CERCLA § 107(b), 42 U.S.C. § 9607(b). Upon all the proceedings had herein and the following findings of fact and conclusions of law, I regretfully find that the Berkman Defendants are unable to claim the protection of CERCLA's affirmative defenses.

### Prior Proceedings

The Government filed its complaint on October 16, 1989. On September 20, 1990, the Court denied a motion by third-party defendant Utica Mutual Insurance Company to dismiss a third-party claim brought against them by Marine Midland Bank, N.A. ("Marine"). *See United States v. A & N Cleaners & Launderers*, 747 F.Supp. 1014 (S.D.N.Y. 1990). On June 5, 1991, this Court ordered that the case be bifurcated for the litigation of liability and damages.

On April 3, 1992 (the "April 3 Opinion"), this Court granted the Government's motion for summary judgment as to the CERCLA liability of the Berkman defendants, but held that triable issues of fact remained as to two statutory affirmative defenses pled by the Berkman defendants, the Third–Party Defense and the Innocent Landowner Defense. *See United States v. A & N Cleaners & Launderers*, 788 F.Supp. 1317 (S.D.N.Y. 1992). The Government made a second motion for summary judgment predicated on newly-discovered evidence, which motion was also denied. The opinion disposing of this motion also ordered that a separate "Phase I" trial be held on the question of the Berkman Defendants' right to the protection afforded by CERCLA's statutory affirmative defenses. *See United States v. A & N Cleaners & Launderers*, 842 F.Supp. 1543 (S.D.N.Y.1994).

After additional discovery, from April 1 to April 4, 1994, the Court conducted the trial. The Court received post-trial submissions from the parties by April 28, 1994, and on May 9, 1994, the Government supplied the Court with a copy of *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir.1994). The Berkman Defen-

dants responded to this submission by letter received by this Court on May 11, 1994. This matter was considered fully submitted as of May 11, 1994.

### Findings of Fact

This action arises out of the Government's investigation of and remedial actions relating to contamination at the Site. The factual background of this matter has been discussed in prior opinions of this Court, familiarity with which is assumed. *See, e.g., United States v. A & N Cleaners & Launderers,* 842 F.Supp. 1543 (S.D.N.Y.1994); *United States v. A & N Cleaners & Launderers,* 788 F.Supp. 1317 (S.D.N.Y.1992); *United States v. A & N Cleaners & Launderers,* 747 F.Supp. 1014 (S.D.N.Y.1990).

Berkman and Petrillo each hold a one-third interest and the Curtos together hold a one-third interest in the Property, which is located at the intersection of Routes 6 and 22 in the Town of Southeast, Putnam County, New York. The Berkman Defendants purchased the Property on March 2, 1979, and own it as tenants-in-common. The Berkman Defendants knew that a dry cleaning business was located on the Property prior to March 2, 1979. (Tr. at 132–33.)

Berkman is an attorney admitted to practice in New York State who specializes in real estate law. He was the Town Attorney for the Village of Brewster from 1975 through 1990.

Petrillo is a builder engaged in the construction business. The Curtos are retired individuals.

Forcucci is the sole shareholder, officer, and director of A & N Cleaners and Launderers, Inc., a/k/a Alben Cleaners & Launderers ("A & N"). At all relevant times, he alone was responsible for the day-to-day operation of the dry cleaning machines at A & N and the disposal of waste.

The Property consists of a one-story brick building (the "Building") akin to a shopping mall, which is surrounded by a parking lot and adjacent grassy area on a total of approximately 1.8 acres. The Building occupies 12,500 square feet. A floor drain (the "Floor Drain") traverses the entire length of the interior of the Building and emptied into a dry well (the "Dry Well") under the parking lot in the rear of the Property until August of 1991.

Defendant Marine was the lessee of the Property from 1970 through 1990. From 1970 to the present, Marine has maintained a branch bank at the Property. Since 1990, Marine's lease at the Property relates only to that part occupied by its branch office. Beginning in October 1990, and continuing to date, A & N has paid rent for that portion of the Building occupied by A & N directly to the Berkman Defendants.

The Well Field has been in operation since 1954. Over the years, the Well Field's configuration and utilization has changed as wells have been installed and replaced. These wells have generally extracted between 300,000 and 400,000 gallons of water per day from the aquifer. The presence of volatile halogenated organic compounds ("VHO's") was first detected in the ground water at the Well Field in 1978.

In December 1982, the Well Field was placed on the National Priorities List ("NPL").[1] On January 18, 1984, the United States Environmental Protection Agency ("EPA") and the New York State Department of Environmental Conservation ("NYDEC") entered into a cooperative agreement, pursuant to CERCLA, whereby NYDEC would perform the Remedial Investigation and Feasibility Study ("RI/FS")[2] for the Site with funds provided by the Superfund. In 1985, NYDEC retained GHR Engineering Associates, Inc. ("GHR") to perform the RI/FS. The purpose of the GHR RI/FS was to determine the nature and extent of contamination at and in the vicinity of the Site.

1. The National Priorities List, established pursuant to CERCLA § 105(a)(8)(B), 42 U.S.C. § 9605(a)(8)(B), lists the sites that EPA intends to address by conducting remedial action.

2. A party responsible for cleaning up a contaminated site is required by various provisions of CERCLA to arrange to have an RI/FS performed, which evaluates the extent of the contamination problem and evaluates alternative proposed remedies at the site. *See Velsicol Chem. Corp. v. City of Memphis,* 9 F.3d 524, 526 n. 21 (6th Cir.1993).

In 1985 and 1986, GHR performed the RI, in the course of which it conducted soil and ground-water sampling at the Well Field and its vicinity. The RI included test pits and soil borings, monitoring well installation, geophysical testing, geologic and hydrogeologic interpretation, and chemical analyses of soil, water, and air. The RI also included recommendations for additional (Phase II) RI work.

The Record of Decision ("ROD"),[3] signed by EPA on September 30, 1986, selected operation of an air stripping system and the "[d]esign and construction of a groundwater management system, consisting of extraction wells, treatment of the extracted water by an additional off-Site air stripper, and reinjection of the treated water, to contain the plume of contamination and restore ground-water quality south of the East Branch Croton River." This phase of the remedial activities was called Operable Unit One ("OU 1").

In 1987 and 1988, a supplemental RI/FS was performed for the EPA by Ebasco Services, Inc. ("EBASCO"). The purpose of the EBASCO RI/FS was to "determine the location, nature and extent of areas of VHO-contaminated soil within the study area that could be considered as 'sources' of contamination affecting the aquifer (groundwater) supplying the Brewster Well Field," and to "[g]ather additional information to better define the location of the zone of maximum concentration in the groundwater contamination plume and to confirm the location of the VHO isoconcentration lines determined on the basis of the initial RI/FS."

During August and September 1987, as part of the supplemental RI, sediment sampling was undertaken from two depth intervals in the Dry Well below the water table, which samples indicated the presence of perchloroethylene ("PCE") and trichloroethylene ("TCE") at the concentrations of 62% and 3.2% respectively.[4] (Joint Pre–Trial Order, Stipulated Facts ¶ 58.)

The 1988 EBASCO RI Report identified the Dry Well on the Property as a "signifi-cant source of VHO contamination." A second ROD was signed by EPA on September 29, 1988. It provided for the excavation and disposal of the Dry Well, the Dry Well sediment, and, as necessary, the surrounding contaminated soils. This phase of the remedial activities was called Operable Unit Two ("OU 2"). Pursuant to the OU 2 ROD, the Dry Well was excavated and removed by EPA in August of 1991.

Forcucci's dry cleaning process resulted in the production of a waste stream associated with his drying machines (the "Dryer Condensate"), which was contaminated with PCE and TCE. In addition, Forcucci's dry cleaning process resulted in the production of a waste stream associated with his ironing machines (the "Ironing Machine Condensate").

Prior to March 1, 1979, Forcucci disposed of the Dryer Condensate down the Floor Drain. Forcucci previously gave conflicting accounts of when he had stopped disposing of the Dryer Condensate down the Floor Drain, which discrepancies can be attributed to Forcucci's misunderstanding the questions posed to him, the Government's misunderstanding Forcucci's responses, and the dimming of memory over time.

At trial, Forcucci was able to fix the date at which he stopped disposing of Dryer Condensate down the Floor Drain by reference to the receipt of a letter from the NYDEC dated March 1, 1979, informing him that the NYDEC disapproved of his disposal practices. Forcucci testified with certainty that, by the time he received this letter, he had stopped disposing of the Dryer Condensate down the drain. (Tr. at 197–98.) This testimony established by a preponderance of the evidence that Forcucci stopped disposing of Dryer Condensate down the Floor Drain prior to the Berkman Defendants' purchase of the Property on March 2, 1979.

Forcucci disposed of Ironing Machine Condensate down the Floor Drain until 1991. (Tr. at 180.) On December 12, 1985, David Sands, the geologist in charge of implementing the GHR field program at the Site, visit-

---

**3.** EPA is required to publish a ROD, setting forth the remedy selected for a contaminated site, by CERCLA § 117, 42 U.S.C. § 9617.

**4.** It is undisputed in this case that PCE and TCE are "hazardous substances" under CERCLA.

ed A & N for the purpose of, among other things, testing the Ironing Machine Condensate. Sands testified at trial that Forcucci pointed out the vessel that collected the Ironing Machine Condensate, and that Sands personally took a sample of the Condensate from the vessel to which he was directed (the "1985 Sample"). (Tr. at 71–72.) The 1985 Sample contained PCE at 117 ug/1. (Joint PTO at 13.)

Sands testified that "[w]e were directed to the sampling point by the manager that was giving us the tour of the facility and we sampled the effluent that was described as the condensate that was being disposed of in the floor drain." (Tr. at 88.) Forcucci also testified that he had indicated the container from which to collect a sample of the Ironing Machine Condensate for testing, and that there was only one place from which such a sample could be taken. (Tr. at 183.)

Forcucci did not remember that he actually watched Sands take the 1985 Sample. (Tr. at 183.) The Ironing Machine Condensate has always accumulated into a vacuum and, at the time that the 1985 Sample was taken, ran through a rubber hose from the vacuum to the floor drain. (Tr. at 159–61.)

Sands could not identify a dry-cleaning vacuum when shown a picture of it. (Tr. at 81–82.) Sands testified that, although his memory was vague, he recalled obtaining the Sample from a cylindrical receptacle that was collecting the condensate. (Tr. at 81–82.)

Defendants' Exhibit DU–10 is a photograph of the dryer at A & N, next to which is a cylindrical bucket. Forcucci testified that this bucket collected contaminated separator water which is collected into fiber containers for hazardous waste haulers to take away. Forcucci testified that a similar, cylindrical bucket stood at the front of the dryer to collect cleaning fluids (Tr. at 155–56), so that, until one month before trial, a cylindrical bucket containing cleaning fluids stood at both the front and the rear of the dryer. (Tr. at 157–58.)

On August 20, 1987, a second sample, also purportedly of the Ironing Machine Condensate, was taken at A & N by Mindy Sayres of EBASCO (the "1987 Sample"). Sayres' sampling procedures for the Ironing Machine Condensate are summarized in Government Exhibit 22, the Final Supplemental Remedial Investigation Report, at page 53. In pertinent part, this Report states that:

> Standard procedure at this facility is to collect the condensate from the ironing machines in a 5–gallon bucket and periodically dispose of this fluid on site by evaporation through an Enviropure System.

As Forcucci testified, and as is also apparent from the photograph of the ironing machine provided by the Defendants, it would be impossible to put a five gallon bucket under the vacuum spigot. (Tr. at 160, Def. Ex. DU 6.) Forcucci testified that the Ironing Machine Condensate never went through the Enviropure System, and that the Enviropure System is only used for the Dryer Condensate. (Tr. at 184.)

Presumably Sayres' testimony could have helped to clarify the source of the 1987 Sample, but the Government declined to call her. The most natural inference from this is that her testimony "would have exposed facts unfavorable to" the Government's case. *Case v. New York C.R. Co.*, 329 F.2d 936, 937 (2d Cir.1964).

In September 1978, the Putnam County Health Department published a notice informing Village of Brewster residents of the Well Field contamination and advising them to boil their water. (Gov. Ex. 13; PTO ¶ 39 of non-disputed facts.) Berkman knew about the boil water notice at or about the time it was issued. (PTO ¶ 40 of the non-disputed facts.)

Newspaper articles in September 1978 discussed the Well Field contamination and specifically described the source of the contamination as "tetrachloroethylene—commonly used as a spot remover or solvent." (Gov. Ex. 42, 43.) Press coverage relating to the Well Field contamination continued in the fall and winter of 1978 and in 1979. (Gov. Exs. 44–49.)

A Village memorandum dated April 1979, on which Berkman was copied, noted the following:

> Meeting Friday, April 30th, 9:30 A.M. at Putnam County Health Dept. to meet with

officials of N.Y. State Dept. of Transportation to conduct Test Borings to determine source of chemical pollution to Village Water Supply.

(Gov. Ex. 65.)

At a meeting of the Brewster Village Board dated August 15, 1979, at which Berkman was present, a Mr. McLaughlin informed the board that he had met with the New York State Department of Transportation ("NYDOT"), and he explained to the Board various aspects of the drilling of test borings on the site. McLaughlin informed the Board that the City of New York Water Supply suggested "that the Village write a letter explaining the procedures being followed on City property and giving some background on the Water System contamination problem. Attorney Berkman will write a letter to Mr. Thomas O'Connell of the Department of Environmental Protection as per Mr. McLaughlin's instructions." (Gov. Ex. 64 at US1472.)

At a Special Meeting of the Village Board on November 16, 1979, at which Berkman was present, Nicholas Valkenburg of Geraghty & Miller summarized that firm's report on the potential for developing additional ground-water supplies for the Village of Brewster. At that meeting, Jacobson Associates "recommend[ed] that the Board authorize Geraghty & Miller to go ahead with phase 2, which includes looking for water, test wells, and staking test borings. The Village needs authorization to go on property where well sites #9 and #7 are; Jordan Berkman is to get authorization." (Gov. Ex. 64 at US1473.)

Several memoranda and letters, dating from April through August 1979, were exchanged between the Village and, among others, the Putnam County Department of Health, NYDEC, and consultants to the Village, concerning the contamination of the Well Field, test boring and sampling to identify the source of the contamination, and the evaluation of alternative water supply sources. Several of these documents were written by or to Berkman, or copies of these documents were sent to Berkman. (*See, e.g.,* Gov. Exs. 66, 67, 68.)

In November of 1979, the local press reported that the chemicals contaminating the Well Field, such as PCE, "may have originated from one or more commercial establishments located in the highly developed area surrounding the intersection of Rtes. 22 and 6 in Brewster." (Gov. Ex. 49.)

In December, 1979, Berkman signed an access agreement on behalf of the Berkman Defendants that permitted access to the Village and/or NYDOT or NYDEC to sample for contamination on the Property "for the purpose of determining the source of contamination of the Village well fields." (Gov. Ex. 63; Tr. at 134.)

In 1985 Petrillo acquired a 25% interest in a one-hundred-thousand square foot shopping center called Towne Centre. Prior to acquiring this interest, Petrillo had heard that some of the properties in the vicinity had "had a problem at some point with something in their soil." Petrillo therefore "hired an engineer to check and see if in fact there were any problems which might come into [the Towne Centre property]." (Tr. at 55–56.)

In May 1987, Berkman received a letter from EPA requesting access to the Property to test for contamination. (Def. Ex. DP.)

From 1979 until 1988, the Berkman Defendants made no contact with Forcucci with regard to his waste disposal practices (Tr. 32., Tr. 142), or his use of his floor drain (Tr. 39). After he signed the access agreement in December 1979, Berkman did not ask Forcucci any questions about his waste disposal practices, nor did he ask NYDOT, NYDEC or EPA about the results of any tests performed on the Property. (Tr. at 134–35.)

### Statutory Framework

Congress enacted CERCLA in 1980 because then-existing laws, particularly the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–92k, were inadequate to respond to the problems raised by hazardous waste produced and abandoned in the past. *See, e.g., United States v. Price,* 577 F.Supp. 1103, 1114 (D.N.J.1983); H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 17–19 (1980), U.S.Code Cong. & Admin.News 1980, p. 6119 (noting that RCRA is

"clearly inadequate" for addressing "massive problem" of existing hazardous waste sites); *see also* Michael P. Healy, *Direct Liability for Hazardous Substance Cleanups under CERCLA: A Comprehensive Approach*, 42 Case W.Res.L.Rev. 65, 72–73 (1992) (CERCLA enacted in response to severe environmental and public health effects posed by abandoned contaminated sites).

While the perceived problem of contaminated sites in this country was large at the time of CERCLA's passage, further study revealed this problem's staggering proportions. It is estimated that between 130,000 and 380,000 sites are potential candidates for government-initiated response actions under CERCLA. Evan Bogart Westerfield, *When Less is More: A Significant Threat Threshold for CERCLA Liability*, 60 U.Chi.L.Rev. 697, 697 n. 4 (1993). It will probably take until the year 2003 to begin construction on the sites that are currently on the NPL, and the EPA estimates that it expects to add sites to the NPL at the rate of 75 to 100 per year. William K. Reilly, Administrator, EPA, *A Management Review of the Superfund Program, reprinted in* 18 Chem.Waste Litig. 400, 406 (1990).

Estimates of the costs of this cleanup are nearly as staggering as the estimates of the contamination to be addressed. *See, e.g.*, Office of Technology Assessment, *Assessing Contractor Use in Superfund, reprinted in* 17 Chem.Waste Litig.Rep. 715, 715 (1989) (cleanup costs under CERCLA estimated at $500 billion dollars, excluding the costs of cleaning up Department of Energy facilities); John T. Ronan III, *A Clean Sweep on Cleanup*, The Recorder, Sept. 30, 1992, at 10 (CERCLA cleanup costs could be as high as $750 billion dollars).

In large part, the time and cost associated with CERCLA cleanups can be attributed to CERCLA's unrealistic method of selecting remedies for contaminated sites. Under CERCLA, cleanup standards must insure protection of human health and the environment, and must attain legally applicable or relevant and appropriate federal and state standards, requirements, criteria, or limitations ("ARARs"), unless the ARAR can be waived in accordance with expressly identified waiver provisions. CERCLA § 121, 42 U.S.C. § 9621.

As many have realized:

Currently, risk assessment and cleanups are based on unrealistic, worst-case risk scenarios that ultimately lead to overly expensive remedies. We need to address the issue of "how clean is clean?" Often times, striving to clean the last ounce of pollution has little environmental benefit but increases cost significantly. We must begin to prioritize and direct our limited resources toward areas that pose the greatest risk. We also need to ask ourselves, "If an industrial site is going to remain an industrial site, does it make sense to clean it up to playground standards?"

140 Cong.Rec. S3965, S3965 (daily ed. March 25, 1994) (statement of Sen. Smith); *see also* 140 Cong.Rec. S1058, S1058 (daily ed. Feb. 7, 1994) (statement of Sen. Baucus) ("[A]t the heart of Superfund's problems are slow, costly, unpredictable, ineffective, and often unnecessary cleanups.... We are throwing ... money down the drain if we try to return sites to pristine conditions, when that's not technically feasible. Or if we clean up sites where risks are negligible. The problem is that Cadillac remedies rob resources from sites where health threats are real and they delay all cleanups.").

While, like the Walrus and the Carpenter, we cherish the ideal of a completely unsullied environment,[5] the translation of this ideal into CERCLA cleanup standards has hampered our ability to respond realistically to the environmental harms we face.

5. *See* Lewis Carroll, *The Annotated Alice* 234 (1960):

The Walrus and the Carpenter
Were walking close at hand:
They wept like anything to see
Such quantities of sand:
"If this were only cleared away,"

They said, "it would be grand!"
"If seven maids with seven mops
Swept it for half a year,
Do you suppose," the Walrus said,
"That they could get it clear?"
"I doubt it," said the Carpenter,
And shed a bitter tear.

Under CERCLA, the Government may take response action whenever there is a release or threatened release of "hazardous substances," and then sue certain persons for reimbursement of the cleanup costs ("Response Costs"). CERCLA § 104, 42 U.S.C. § 9604. Private parties are also entitled, and encouraged, to implement remedial action under CERCLA. *See* Donald W. Stever, *Law of Chemical Regulation and Hazardous Waste* § 6.06[2][d][ii][C]. These parties may thereafter sue to recover their Response Costs.[6] CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).

■ To establish liability, a plaintiff must demonstrate that (1) there has been a "release" or a "substantial threat of release"[7] of a "hazardous substance"[8]; (2) from a "facility";[9] (3) which caused the plaintiff to incur Response Costs;[10] and (4) each of the defendants fits within one of the categories of potentially responsible parties ("PRPs") identified under CERCLA § 107(a), 42 U.S.C. § 9607(a). *A & N Cleaners*, 788 F.Supp. at 1322. Among the four classes of PRPs under CERCLA § 107(a) are the current "owner and operator" of the facility.

■ Absent a showing by a preponderance of the evidence that one of the affirmative defenses contained in CERCLA § 107(b), 42 U.S.C. § 9607(b), has been satisfied, PRPs' potential liability for Response Costs is strict. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992); *New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985). Where the environmental harm is indivisible, liability is also joint and several. *B.F. Goodrich*, 958 F.2d at 1197.

Under the "Third–Party Defense" set forth in CERCLA § 107(b)(3), a defendant is not liable if it establishes that the release or threatened release was caused solely by:

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and

6. In its 1990 revisions to the National Contingency Plan, EPA took the position that there is no requirement that a site be listed on the NPL before a private party may incur response costs remediating the site that are recoverable under CERCLA § 107. *See* 55 Fed.Reg. 8666, 8793 n. 29 (1990).

7. A "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant). CERCLA § 101(22), 42 U.S.C. § 9601(22).

8. A "hazardous substance" is "(A) Any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of [CERCLA], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112

of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof ... natural gas, natural gas liquids, liquified natural gas, or synthetic gas useable for fuel...." CERCLA § 101(14), 42 U.S.C. § 9601(14) (citations omitted).

9. A "facility" is defined as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.... CERCLA § 101(9), 42 U.S.C. § 9601(9).

10. Response costs incurred by the Government must be "not inconsistent with" the National Contingency Plan, while Response Costs incurred by private parties must be "consistent" with the National Contingency Plan. CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).

circumstances [the "Due Care Requirement"], and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result for such acts or omissions [the "Precautionary Requirement"].

The second defense relevant to this case, the "Innocent Landowner Defense," is actually a special case of the Third–Party Defense. In 1986 Congress created an exception to the "no contractual relationship" requirement of the Third–Party Defense, thereby making it available to some owners who acquired the relevant property after the disposal or placement of hazardous substances occurred. CERCLA § 101(35)(A), 42 U.S.C. § 9601(35)(A), defines "contractual relationship" for purposes of CERCLA § 107(b)(3) as including "land contracts, deeds or other instruments transferring title or possession," *unless:*

> the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility and. . . . [a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

*See* CERCLA § 101(35)(A), 42 U.S.C. § 9601(35)(A).

To qualify as an Innocent Landowner under CERCLA § 101(35)(A), one must have undertaken "all appropriate inquiry into the previous ownership and uses of the property, consistent with good commercial or customary practice" at the time of transfer. CERCLA § 101(35)(B), 42 U.S.C. § 9601(35)(B). "Good commercial or customary practice" is not defined in the statute, and the relevant legislative history is vague, indicating that "a reasonable inquiry must have been made in all circumstances, in light of best business and land transfer principles." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess., at 187 (1986). In deciding whether a defendant has complied with this standard, courts consider any specialized knowledge or expertise the defendant has, whether the

purchase price indicated awareness of the presence of a risk of contamination, commonly known or reasonable information about the property, the obviousness of the presence of contamination at the property, and the ability to detect such contamination by appropriate inspection. CERCLA § 101(35)(B), 42 U.S.C. § 9601(35)(B).

Landowners who meet the requirements of CERCLA § 101(35)(A) will not be found to be in a "contractual relationship" with the party responsible for the release of hazardous substances at the property. To obtain the protection of the Innocent Landowner Defense, they must also meet the Due Care and Precautionary Requirements of CERCLA § 107(b)(3)(a) and (b). *See* CERCLA § 101(35)(A), 42 U.S.C. § 9601(35)(A).

The Due Care Requirement, also undefined in the statute, has been interpreted as requiring that a defendant demonstrate that it took necessary steps to prevent foreseeable adverse consequences arising from the pollution on the site. *Kerr–McGee Chem. Corp.,* 14 F.3d at 325 & n. 3 (due care not established when PRP took no affirmative measures to clean site); *United States v. DiBiase Salem Realty Trust,* No. 91–11028–MA, slip op. at 15 (D.Mass. Nov. 19, 1993) (CERCLA's affirmative defenses not available when defendant took no steps to prevent harm from hazardous substances); H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 34 (1980) U.S.Code Cong. & Admin.News 1980, p. 6137 ("to establish that he exercised due care, the defendant must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken"); H.R.Rep. No. 253, 99th Cong., 2d Sess. 187 (1986) (due care "would include those steps necessary to protect the public from a health or environmental threat"); *cf. Lincoln Props. v. Higgins,* 823 F.Supp. 1528, 1543 (E.D.Cal.1992) (defendant exercised due care by taking contaminated wells out of service and destroying them in manner intended to prevent further contamination); *In re Sterling Steel Treating, Inc.,* 94 B.R. 924, 930 (Bankr.E.D.Mich.1989) (defendant exercised due care after discovering hazardous waste

on property when it took immediate steps to properly dispose thereof).

■ The Precautionary Requirement is satisfied by taking precautionary action against the foreseeable actions of third parties responsible for the hazardous substances in question. *United States v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

■ Both the Third–Party Defense and the Innocent Landowner Defense are affirmative defenses, requiring the defendant to prove each of the required elements by a preponderance of the evidence. *City of New York v. Exxon Corp.,* 766 F.Supp. 177, 195 (S.D.N.Y.1991); *United States v. Price,* 577 F.Supp. 1103, 1114 (D.N.J.1983) (defendant has burden of showing exercise of due care). A defendant's failure to meet its burden on any one of the required elements precludes application of the defense. *In re Sterling,* 94 B.R. at 929.

■ While liability under CERCLA is strict, the question of causation is not absent from liability considerations under CERCLA § 107. CERCLA's affirmative defenses shift the burden of proof on this question from the plaintiff to the defendant, who must show by a preponderance of the evidence that the release or threatened release was caused solely by an unrelated third party. *See Shore Realty Corp.,* 759 F.2d at 1044–45 & n. 17; *United States v. Stringfellow,* 661 F.Supp. 1053, 1061 (C.D.Cal.1987) (third-party defense applies "only where a totally unrelated third party is the sole cause of the release or threatened release of a hazardous substance"); *O'Neil v. Picillo,* 682 F.Supp. 706, 728 (D.R.I.1988) ("third-party defense 'essentially serv[s] to shift the burden of proof of causation to the defendants' ") (quoting *Violet v. Picillo,* 648 F.Supp. 1283, 1293 (D.R.I.1986)), *aff'd,* 883 F.2d 176 (1st Cir. 1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); Developments, *Toxic Waste Litigation,* 99 Harv. L.Rev. 1458, 1544 (1986).

A hastily drafted piece of legislation, rushed through Congress upon minimal debate following the Presidential election of 1980, Healy, *supra,* at 68 n. 5; *Shore Realty,* 759 F.2d at 1037, CERCLA is now viewed nearly universally as a failure, *see, e.g.,* 140 Cong.Rec. E602, E602 (daily ed. March 24, 1994) (statement of Mr. Zeliff) ("It is time for Congress to admit they made mistakes in Superfund law ... a law that has gone awry."); 140 Cong.Rec. S3965, S3965 (daily ed. March 25, 1994) (statement of Sen. Smith); Estelle Fishbein, *Superflop; The Failure of Superfund, and the Flawed Plan to Fix it,* Wash. Post, April 22, 1994, at A25. Evidence of CERCLA's deficiency can be seen in the fact that, after fourteen years and over eighteen billion dollars spent on the CERCLA program, only 12% of the sites on the NPL have been cleaned up. 140 Cong. Rec. S3965, S3965 (daily ed. March 25, 1994) (statement of Sen. Smith).

■ CERCLA's liability scheme was intended to ensure that those who were responsible for, and who profited from, activities leading to property contamination, rather than the public at large, should be responsible for the costs of the problems that they had caused. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 716 (2d Cir. 1993); *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986) ("Congress intended [through passage of CERCLA] that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created."); *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 805–06 (S.D.Ohio 1983); Lynda J. Oswald, *Strict Liability of Individuals under CERCLA: A Normative Analysis,* 20 B.C.Envtl.Aff.L.Rev. 579, 635 (1993); Jerry L. Anderson, *The Hazardous Waste Land,* 13 Va.Envt'l L.J. 1, 7 (1993); *Development in the Law: Toxic Waste Litigation,* 99 Harv.L.Rev. 1465, 1477 (1986).

■ In addition, Congress intended CERCLA's liability scheme to provide incentives for private parties to investigate potential sources of contamination and to initiate remediation efforts. *See Carlyle Piermont Corp. v. Federal Paper Bd. Co.,* 742 F.Supp.

814, 817 (S.D.N.Y.1990) (quoting *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 617 (S.D.N.Y.1986)) ("One of the major objectives of the private recovery provisions of CERCLA is to 'assure an incentive for private parties, including those who may themselves be subject to liability under the statute, to take a leading role in cleaning up hazardous waste facilities as rapidly and completely as possible.'"); *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 694 (9th Cir.1988) (one of CERCLA's purposes is to promote private enforcement actions independent of government actions funded by Superfund); *Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 386 (8th Cir.1987) ("Since superfund money is limited, Congress clearly intended private parties to assume clean-up responsibility."); *Chem–Dyne Corp.*, 572 F.Supp. at 805 (CERCLA passed, in part, to induce voluntary private responses at contaminated sites).

The imposition of strict liability solely on the basis of property ownership, however, does something other than cause handlers of dangerous substances to be responsible for the hazards they create. It transfers the costs of the national problem of remediating abandoned contaminated sites onto the shoulders of individuals involved in real estate transactions, many of whom had never violated any environmental regulation, thereby negating Congress' intention of making those responsible for causing contamination pay for its remediation. *See* Anderson, *supra*, at 6 ([CERCLA c]leanup costs are often borne by those who are not responsible for the problem at all and ... many other parties are held liable to an extent far exceeding their actual responsibility."). The Second Circuit has noted that:

> In passing CERCLA Congress faced the unenviable choice of enacting a legislative scheme that would be somewhat unfair to generators of hazardous substances or one that would unfairly burden the taxpaying public. The financial burdens of toxic clean-up had been vastly underestimated—in 1980 when CERCLA was enacted $1.8 billion was thought to be enough. In 1986 when the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986),

was passed, $100 billion was held to be needed. It may well be more today. It is of course the public-at-large that is already bearing the economic brunt of this enormous national problem. There may be unfairness in the legislative plan, but ... we still must take this statute as it is.

*Alcan*, 990 F.2d at 716–17.

*Alcan* involved a generator of hazardous wastes who knowingly sent contaminated waste to a site for disposal and treatment. If imposing CERCLA liability on such defendants is "unfair," it is immeasurably more so to impose CERCLA liability on unwitting owners of contaminated property that have played *no part in the activities leading to the* contamination. *See also* 140 Cong.Rec. S3965, S3965 (daily ed. March 25, 1994) (statement of Sen. Smith) (claiming that CERCLA liability structure is unfair and violative of the spirit of the Constitution); Anderson, *supra*, at 4 (describing CERCLA liability structure as "manifestly unfair"); *Congress, Industry, Regulators Gearing up for Head Start on Upcoming Reauthorization*, 23 Env't Rep. (BNA) 1579, 1580 (1992) (quoting Randolph W. Deitz, counsel for the House Public Works & Transportation Subcommittee on Investigations and Oversight, in reference to the CERCLA liability system: "Of course it isn't fair. We did not want taxpayers to have to pay for it."). *But see United States v. Price*, 577 F.Supp. 1103, 1114 (D.N.J.1983) ("Though strict liability may impose harsh results on certain defendants, it is the most equitable solution in view of the alternative—forcing those who bear no responsibility for causing the damage, the tax payers, to shoulder the full cost of the clean up.").

CERCLA's narrow affirmative defenses do little to alleviate the unfairness of the statute's liability scheme, particularly in cases where liability is predicated solely on property ownership. By restricting the application of the Defenses to those that have complied with a series of ill-defined due care and investigatory requirements, CERCLA in practice imposes the costs of the public problem of ferreting out contaminated sites onto the private individuals involved in real estate

transactions and ownership without even providing reasonable guidance on what these property owners must do to meet their obligations. *Cf.* 139 Cong.Rec. E147 (daily ed. Jan. 25, 1993) (statement of Mr. Weldon) (criticizing lack of definition of inquiry requirement for Innocent Purchaser Defense); *United States v. Mottolo,* 605 F.Supp. 898, 902 (D.N.H.1985) (criticizing CERCLA's "vaguely-drafted provisions").

The assignment of the burden of proof on causation to defendants pleading the third-party defense also leads to unjust results. While it is true that "[t]raditional tort law has … imposed strict liability while recognizing a causation defense," *Shore Realty,* 759 F.2d at 1044 n. 17, this doctrine often applies when each of the defendants engaged in blameworthy activity, or where the defendants have superior access to relevant information, *see, e.g., Sindell v. Abbott Labs.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980) (all defendant manufacturers of drug that caused plaintiff's injury held liable unless they demonstrated that they could not have made the product involved), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687 (1944) (applying doctrine of *res ipsa loquitur,* which shifts to defendant burden of producing evidence of causation where evidence is practically available to defendants but not to plaintiff).

The only blameworthy activity that many property owners facing CERCLA liability have engaged in is the failure to comply with the host of amorphous and undefined due care requirements necessary for establishing CERCLA's affirmative defenses. Also, as demonstrated by the present case, the Government's access to the highly technical information necessary to identify contamination is often superior to that of the ordinary landowner. Rather than preventing blame-

worthy defendants from escaping liability, shifting the burden of proof of causation to defendants merely helps ensure that the Government will recoup their Response Costs, "at the cost of imposing liability upon some individual defendants who caused no harm, but are unable to prove it by a preponderance of the evidence." *Toxic Waste Litigation, supra,* at 1544; *see also O'Neil,* 682 F.Supp. at 728 (third-party defense will not apply when equally likely that third-party was or was not solely responsible for contamination).

In addition to its unfairness, the liability structure of CERCLA is counter-productive. PRPs faced with disproportionate liability litigate tenaciously, prolonging or postponing remediation of contaminated sites and increasing dramatically the costs of remediation. *See* 140 Cong.Rec. S3965, S3965 (daily ed. March 25, 1994) (statement of Sen. Smith) (50% of costs at most Superfund sites are legal and other transaction costs); Anderson, *supra,* at 5; Frona M. Powell, *Insuring Environmental Cleanup,* 71 Neb. L.Rev. 1194, 1196 (1992) (noting 1992 RAND Institute for Civil Justice study finding that only 12% of CERCLA-related monies paid by insurance companies went to actual cleanup, while 78% went to legal and other non-cleanup related transaction costs).

Uncertainty over what investigatory steps property owners must take to avoid CERCLA liability has cast a pall over the real estate market, with unfortunate effects on the general economy.[11] Douglas F. Rohrman & Michael J. Hoffman, *Environmental Audits: Assessing Environmental Liability in Real Estate Transactions,* 77 Ill.B.J. 690 (1989); H. Glenn Boggs, *Real Estate Environmental Damage, The Innocent Residential Purchaser and Federal Superfund Liability,* 22 Envtl.L. 977, 978–79, 986 (1992).[12]

---

11. Recognition of the unjust and counterproductive effects of the current CERCLA liability structure can be seen in proposals, currently pending before Congress, that would eliminate retroactive liability and would replace joint and several liability with proportional liability allocation based, in part, on responsibility for the subject contamination. *See, e.g.,* Comprehensive Superfund Improvement Act of 1994, S. 1994; Superfund Reform Act of 1994, S. 1834.

12. This uncertainty concerning what must be done to qualify for CERCLA's affirmative defenses may even discourage investigation. Environmental audits can be enormously expensive. One Florida environmental auditing firm, for example, charges up to $3,500 per acre for environmental audits, and possibly much more, depending on the characteristics of the site. Boggs, *supra,* at 984–85, and investigation imposes delays on the transfer of property, and can

If Congress must shift the costs of ferreting out contamination from the general public to those involved in real estate transactions it should, at a minimum, define the scope of the required investigation. *See* 139 Cong.Rec. H218 (daily ed. Jan. 25, 1993) (statement of Mr. Weldon) (introducing H.R. 570, bill to amend CERCLA to provide specific definition of "all appropriate inquiry" for purposes of innocent landowner defense, since lack of such definition impaired purposes of the Defense); James McNerney, *Innocence is a Virtue Seldom Found in a Landowner*, 342 PLI/Real 379 (1989) ("The question that has caused the greatest loss of sleep is: 'Am I an innocent purchaser?' Following that as natural corollaries for the insomniac are: 'Have I done a thorough investigation?'; 'How much is enough?'").

Were the Berkman Defendants to have had a clear, intelligible mandate from Congress or the EPA regarding the investigation they should have conducted prior to purchasing the Property and the monitoring that they should have conducted since its purchase, it is doubtful that they would be before the Court at this time. By imposing a standard of diligence which the Government itself can neither meet nor define, CERCLA has imbued the conduct of business with unnecessary peril, and has made the current Defendants liable for our collective failure to fashion a reasonable response to the problems of chemical contamination.

### Conclusions of Law

A & N has, beginning in October, 1990, paid rent directly to the Berkman Defendants, therefore Forcucci and the Berkman Defendants have been in a direct contractual relationship since October 1990. *See* CERCLA § 101(35)(A), 42 U.S.C. § 9601(35)(A) (defining "contractual relationship" for purposes of CERCLA § 107(b)(3) as including land contracts or other instruments transferring title or possession); *A & N Cleaners*, 788 F.Supp. at 1326–28 (holding that lease constitutes "contractual relationship" under CERCLA and that determinant factor in es-

tablishing such a relationship is flow of benefits or obligations between parties).

The Berkman Defendants have demonstrated by a preponderance of the evidence that Forcucci stopped dumping the Dryer Condensate prior to the time that they purchased the Property. The Berkman Defendants have shed considerable doubt on the Government's tests of the Ironing Machine Condensate. If, as the Final Supplemental Remedial Investigation Report indicates, the 1987 Sample was of a substance that was collected in a five-gallon bucket and processed through the Enviropure System, it seems highly unlikely that this Sample was of the Ironing Machine Condensate. In addition, the types and amounts of contaminants found in the 1987 Sample, PCE at 38,000d ug/1, TCE at 580e ug/1, and 111 TCA at 19 ug/1, seem more in line with the earlier samples of the Dryer Condensate than with the 1985 Sample, in which only 117 ug/1 of PCE were found.

Sands' testimony with regard to the taking of the 1985 Sample leaves doubts regarding the accuracy of this test as well. While Forcucci directed Sands to the sampling point, he did not actually watch him take the Sample, and Sands' recollection of the receptacle from which he took the Sample evokes the conjecture that this Sample was also of something other than the Ironing Machine Condensate. The best that can be said is that it is equally likely that the test was of Ironing Machine Condensate or some other substance.

It was not until 1993, roughly four years after the Government filed this lawsuit, that EPA first took the position that the disposal of the Ironing Machine Condensate constituted a release of hazardous substances. It is ironic that, if the Berkman Defendants' liability were predicated solely on the disposal of the Ironing Machine Condensate, they would not be liable under CERCLA, since the Government would not have demonstrated that there has been a release or a substantial threat of release of a hazardous substance from A & N. Even if the Government had

---

trigger reporting or remediation obligations that would not have been incurred if the contamination had not come to light. An uncertain chance

of qualifying for the innocent purchaser defense may be seen as insufficient to justify these costs and risks.

established that the 1985 Sample was of Ironing Machine Condensate, the small amount of PCE detected in this Sample might have qualified the Berkman Defendants for a *de minimis* settlement under CERCLA § 122(g), 42 U.S.C. § 9622(g).[13]

■ However, since the Berkman Defendants' liability is predicated on their unwitting ownership of contaminated property, rather than on any disposal of waste which might have occurred on the Property since they purchased it, they bear the burden of showing that a totally unrelated third party is the sole cause of the release of hazardous substances in question. As it is equally likely that the Ironing Machine Condensate is contaminated or that it is not contaminated, and since Forcucci disposed of the Ironing Machine Condensate down the Floor Drain until 1991, the Berkman Defendants have failed in this burden. This conclusion precludes the application of either of the Defenses to the Berkman Defendants.[14]

■ Both the Third–Party Defense and the Innocent Landowner Defense also require that a defendant establish by a preponderance of the evidence that he or she fulfilled the Due Care Requirement and the Precautionary Requirement. Willful or negligent ignorance about the presence of or threats associated with hazardous substances does not excuse a PRP's non-compliance with either of these requirements. *United States v. DiBiase Salem Realty Trust,* No. 91–11028–MA, slip op. at 15 (D.Mass. Nov. 19, 1993) (Due Care Requirement); *Shore Realty Corp.,* 759 F.2d at 1048–49 (Precautionary Requirement); *Monsanto Co.,* 858 F.2d at 169 (failure to take precautionary actions with respect to the foreseeable actions of third parties will not be excused by willful or

negligent blindness to those third parties' activities); *United States v. Bliss,* 667 F.Supp. 1298, 1304 n. 3 (E.D.Mo.1987) ("[W]illful ignorance of how a third party disposes of a hazardous substance would preclude use of [Third–Party] defense.").

In this action, this Court has previously held that:

> [G]iven the [existence of various] newspaper articles, Berkman's consent to have the Village of Brewster take borings on the Property "for the purpose of determining the source of contamination in the Village well fields," and the extent of investigative activity that apparently was taking place at the Property, the Berkman Defendants were sufficiently aware that they should have made inquiry of the various subtenants.

*A & N Cleaners,* 788 F.Supp. at 1329.

In addition to inquiring as to Forcucci's disposal practices, the Berkman Defendants should have made inquiries to environmental officials regarding the status of the Property and the legality of their tenants' and subtenants' disposal practices. In the exercise of due care, this inquiry should have been made in 1979 or soon thereafter, following Berkman's signing of the access agreement, and while he was in receipt of information regarding investigations into the contamination of the Well Field.

Even if, after proper investigation, the Berkman Defendants were told that Forcucci was no longer improperly disposing of hazardous substances, they would have learned that he had disposed of hazardous substances down the Floor Drain prior to 1979. After making this discovery, due care would have required that they take some steps to ascer-

---

**13.** This section allows for expedited administrative or judicial settlements and broad covenants not to sue for property owners when the amount of money involved is a minor portion of the Response Costs at the facility, the defendant did not conduct or permit the generation, transportation, storage, treatment, or disposal of any hazardous substance at the facility, did not contribute to the release or threat of release through any action or omission, and did not purchase the property with actual or constructive knowledge that the property was used for the generation, storage, treatment, or disposal of any hazardous substance. There are no fixed criteria for eligi-

bility for a *de minimis,* settlement, and the decision regarding whether to offer such settlements is made on a site-specific basis. *See Streamlined Approach for Settlements with De Minimis Waste Contributors under CERCLA Section 122(g)(1)(A),* OSWER Directive No. 9834.7–1D (7–30–93).

**14.** In addition, since the Ironing Machine Condensate was disposed of down the Floor Drain after the Berkman Defendants' purchase of the Property, they may not avail themselves of the Innocent Landowner Defense.

tain the nature of any environmental threats associated with this disposal. Such steps could have included hiring an engineer to test the soil on their property, as Petrillo did in 1985 at Towne Centre, contacting EPA, NYDEC, NYDOT, or the Putnam County Department of Health to discuss a the problem, cleaning up the Property themselves and thereafter seeking recovery of their response costs, or taking such other actions which, in light of a full evaluation of the relevant facts and circumstances, were appropriate. The Berkman Defendants were prevented from considering these options by their failure to inquire into Forcucci's disposal practices.

Under the circumstances of this case, where the Berkman Defendants had reason to inquire of Forcucci and the relevant environmental officials regarding Forcucci's disposal practices, the failure to so inquire was itself a lack of due care with respect to the hazardous substances which were later found on the Property. It is no defense to insist that, in the course of its ongoing testing, the Government should have notified the Berkman Defendants that there was a problem on the Property, since Congress has seen fit to shift the public responsibility of locating contamination onto the shoulders of individual property owners.

The Berkman Defendants have failed to demonstrate by a preponderance of the evidence that they exercised due care with respect to the hazardous substances on the Property in light of all relevant facts and circumstances. As this is an element upon which the Defendants had the burden of proof under both the Third–Party and the Innocent Landowner Defenses, the Defendants can not invoke the protection that these Defenses provide.

### Divisibility

█ The Berkman Defendants claim that, even if the Court finds the Innocent Landowner and Third–Party Defenses inapplicable to them, this Court should make a determination respecting the divisibility of their liability at this time. In *United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir.1993), the Second Circuit held that a PRP could escape liability for response costs

if it met its burden of demonstrating that its wastes did not contribute to the release or response costs in question, or that its wastes contributed at most only a divisible portion of this harm.

The Court of Appeals acknowledged that, in a CERCLA proceeding, questions relating to liability could be decided separately from, and before, questions relating to damages. While the court indicated that it may be contrary to the statutory dictates of CERCLA to address the question of divisibility in the initial liability phase of a CERCLA proceeding, the decision of when to address the divisibility question is left to the discretion of the trial court. *Alcan,* 990 F.2d at 723.

In the April 3 Opinion, this Court granted the Government summary judgment with regard to the liability of Marine and the Berkman Defendants because it was undisputed that the Government had incurred costs investigating contamination on the Property. The Court specifically declined to reach a conclusion as to whether the release on the Property "was a substantial factor, or any factor at all, in the Well Field contamination," and held that this issue would be determined in a later phase of this proceeding. *A & N Cleaners,* 788 F.Supp. at 1325.

The parties have agreed that the issue of whether a release of hazardous substances from the Property was a substantial factor or any factor at all in the Well Field contamination will be decided at a subsequent phase of this proceeding. (Joint PTO at 91.) Defendant Marine, which contends that a release from the Property was not a factor in the Well Field contamination, was not before the Court in Phase I of this proceeding.

It would be inappropriate to make any determination regarding divisibility at this stage of the proceedings, because the potential scope of the Defendants' collective liability is as yet undetermined. Accordingly, the Court declines the Defendants' invitation to make any determination regarding the divisibility of their liability at this time.

### Conclusion

For the reasons discussed above, the Berkman Defendants are not entitled to rely on

the Innocent Purchaser or Third–Party Defenses.

It is so ordered.